# EXHIBIT "A"

JUDGE FORREST

Robert L. Greener, Esq.
LAW OFFICE OF ROBERT L. GREENER
112 Madison Avenue, 6th Floor,
New York, NY 10118
(646)415-8920 Phone
(212) 689-9680
rlg@greenerlegal.com
(RG8089)
Attorney for Plaintiff MAMBU BAYOH

# 18 CV 5820

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No.

MAMBU BAYOH.

COMPLAINT FOR COPYRIGHT
INFRINGEMENT

                               Plaintiff,

         v.

JURY TRIAL REQUESTED

AFROPUNK FEST 2015 LLC, AFROPUNK LLC,
AFROPUNK GLOBAL INITIATIVE LLC., and
MATTHEW MORGAN, JOCELYN COOPER, and
JOHN DOE and JANE DOE 1-10 individually.
                                Defendants.

Plaintiff, MAMBU BAYOH, by his undersigned attorney the LAW OFFICE OF ROBERT L.

GREENER P.C., for its Complaint against, Defendants, alleges as follows:

## NATURE OF THE ACTION

1.      This is a suit by Plaintiff, MAMBU BAYOH (hereinafter "BAYOH") against Defendants

AFROPUNK FEST 2015 LLC (hereinafter "Afropunk 2015 LLC"), AFROPUNK LLC (hereinafter

Afropunk LLC"), AFROPUNK GLOBAL INITIATIVE LLC. (hereinafter "AGI"), and MATTHEW

MORGAN (hereinafter "Morgan"), and JOCELYN COOPER (hereinafter Cooper") and for

preliminary and permanent injunctions, statutory damages, treble damages or profits,

1

compensatory damages, punitive damages, pre-judgment interest, attorneys' fees, investigators' fees and costs from defendants for each of Plaintiff's Copyrights that Defendants have willfully and maliciously infringed on.

## PRELIMINARY STATEMENT

2.      Plaintiff brings this action seeking to put an immediate stop to, and to obtain redress for, Defendants' blatant and purposeful infringement of the Plaintiff's photographic works and specifically the composition entitled "Such and Such."

3.      Plaintiff is an up and coming photographer, artist and filmmaker. His work has appeared in many prestigious art magazines, publications and literature such as OK Africa, Vogue Italia, Complex Magazine, GQ and ID Magazine to name a few. His work has also appeared in the New York Times Portfolio Review, and Plaintiff has had several books published, including one for Rizzoli; in addition, Plaintiff was asked to be a consultant for the remake of "Roots" by A&E Networks, among other honors.

4.      Recognizing Plaintiff's popularity, talent and goodwill, and in a brazen and improper effort to capitalize on Plaintiff's hard work and talent, Defendants have used multiple photographs owned by Plaintiff for their promotion and marketing, and for the look and feel of their music festivals over the last three years. Almost all of the on-line and off-line marketing and promotional materials, including ones at the festival site itself, used the Plaintiff photographic works.

2

4.      Defendants' conduct is causing, and unless immediately enjoined will continue to cause, enormous and irreparable harm to Plaintiff. Defendants may not continue to exploit Plaintiff's Photographic compositions without authorization in order to advertise, promote, and sell tickets to their music festival, and/or to sell merchandise to the public. Defendants' conduct must immediately be stopped and Plaintiff must be compensated for Defendants' willful acts of infringement.

## JURISDICTION AND VENUE

5.      This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act of the United States, 17 U.S.C. § 101, et seq.

6.      This Court has subject matter jurisdiction over this copyright infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has personal jurisdiction over Defendants because, among other things, Defendants are doing business in the State of New York and in this judicial district, the acts of infringement complained of herein occurred in the State of New York and in this judicial district, and Defendants have caused injury to Plaintiff and his intellectual property within the State of New York and in this judicial district.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c), and/or§ 1400(a).

## THE PARTIES

8.      Plaintiff is an artist and filmmaker.  His photographic works have been featured in many different publications and have gained widespread recognition.

3

9.       Defendant Afropunk LLC, is a limited liability corporation organized and existing under the laws of the State of New York, with its principal place of business at 350 Grand Avenue Brooklyn, NY and is engaged in the business of, among other things, advertising, marketing and selling tickets to a yearly global musical festival titled "Afropunk music fest".

14.      Defendant Afropunk 2015 Fest, is a limited liability company organized and existing under the laws of the State of New York, with its principal place of business located, based on information and belief, at 350 Grand Avenue Brooklyn, N.Y. Afropunk 2015 is, based on information and belief, a Limited liability company wholly owned by Afropunk LLC, Morgan and Cooper and is engaged in the business of, among other things, production of musical festivals.

15.      Defendant AGI, is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 350 Grand Avenue, Brooklyn NY. AGI is a non-for-profit organization, based on information and belief, wholly owned by Afropunk and engaged in social welfare activities and community outreach on behalf of Afropunk LLC.

16.      Defendant Morgan, based on information and belief, is the owner and managing member of Defendants Afropunk LLC, Afropunk 2015 LLC and AGI.

17.      Defendant Cooper, based on information and belief, is partners with Morgan and is a co-owner and managing member of Afropunk LLC, Afropunk 2015, and AGI.

4

18.     John Doe and Jane Doe 1-10 are other members of the aforementioned Limited Liability Companies currently unknown to Plaintiff.

19.     Afropunk bills themselves as a music and cultural festival primarily focused on black music and culture. It includes live music, art, film and cultural presentations. It started in Brooklyn in 2006 and since has expanded to include Atlanta, Georgia; Paris, France; Johannesburg, South Africa; and, London, England. Thousands of people attend these festivals every year, and Afropunk themselves claim 60,000 people a year attend their events with over 90,000 attendees globally.[1]

20.     Based on information and belief, Morgan is the owner and creator of the ethnic festival called Afropunk. He works with Jocelyn Cooper as co-owner and co-director director of the festival.

## FACTS COMMON TO ALL DEFENDANTS

21.     Plaintiff is the sole owner of the photographic works that are at issue herein.

22.     Plaintiff filed an application for copyright registration with the United States Copyright Office for the photographic composition "Such and Such" in June 2017 and the registration was issued on July 19, 2017 with Registration Number VA2-064-499. Annexed as Exhibit "A" is a true and correct copy of Plaintiff's copyright registration. The photographs, which are the subject of the registration, are contained as part of Exhibit "B".

---

[1] Source: https://en.wikipedia.org/wiki/Afropunk_Festival

23.     The photographs contained in Exhibit "B" were taken between 2013 and 2014.   In 2010

Plaintiff created the Website "Stay Sucka free" to display his work. The meaning behind this site was

that black and brown people should not fall for the false stereotypes that the media portrays about them.

The site not only displayed his photographs, but also conveyed his philosophy about art and culture.

The photos were also displayed on a specially created site titled "By Such and Such".


24.     Plaintiff had made some money at the time but was not yet recognized in the commercial

photography community. Word spread about Plaintiff's art through on-line promotion of his work,

resulting in Plaintiff gaining public notoriety about his work.  Plaintiff's aesthetic and philosophy

resonated with people, generating many favorable comments and reviews.  Because of the recognition

of his photo work, Plaintiff started getting hired to do commercial shoots and gained a reputation in the

world of business, art and photography for his work.


25.     Some of the commercial shoots that Plaintiff was hired on were for OK Africa, Vogue Italia,

GQ, Complex Magazine, 10 Deep and ID Magazine.  His work has also appeared at the A3C Festival

in Atlanta, and on the Instagram proprietary page for the Lagos photo festival.


26.     In and around 2015, Plaintiff was contacted by Afropunk about using some of Plaintiff's

Photographs.  On May 7, 2015, Sabla Stays, (hereinafter "Stays") the graphic designer for the

Afropunk festivals, contacted Plaintiff via email to discuss using several of the Photographs she saw on

the "By Such and Such" site for Afropunk's promotional website. Ms. Stays stated that she wanted to

use the Photos, including others she saw, for a redesign of the Afropunk website. She stated that the

6

redesigned site was going to be the main site for their 2015 festival. The Photos she was interested in were shots that Plaintiff took while he attended the 2012-2014 Afropunk festivals in Brooklyn.

27.    Ms. Stays stated that the Photos had the "look and feel" of what they wanted to re-brand Afropunk as from a cultural and artistic perspective. Plaintiff then entered discussions with Defendants about Defendants using Plaintiff's Photos.

28.    Plaintiff did not wish to hand over his Photographs freely, and stated that only through compensation would he allow limited use of the Photos, wile also retaining all rights.

29.    Stays responded to the statement from Plaintiff in a curious way. She expressed that she thought that Plaintiff had already been paid by the festival to take the pictures. Plaintiff informed her that Afropunk had not paid for the works. Ms. Stays then contacted Matthew Morgan to discuss this, and she forwarded Plaintiff a series of emails between her and Mr. Morgan regarding the photos.

30.    In the email chain Mr. Morgan had requested to speak to Plaintiff directly, which the parties did on May 14, 2015. Morgan informed Plaintiff that he liked the work and that it had the ethos that he was promoting with his Afropunk initiatives. He stated that Plaintiff's works displayed the strong but carefree nature of the black culture in America. This was an important issue at the time as it was around the same period as the protests in Ferguson, Mo. and in Baltimore, over the killing of two black men. Race was forefront in America in a way it had not been in a generation or more.

7

31.     Morgan tried to sell Plaintiff on allowing the use by flattering Plaintiff, stating that Morgan felt the Photos told an important story about Black Culture, which was part of the theme for his festival-a safe place where black Americans could be free to express themselves without fear of violence or judgment and where they could feel the equality of black culture.

32.     Plaintiff liked what he heard as it reflected his own beliefs at the time.  However, Plaintiff reiterated that despite what Morgan said, Plaintiff was a struggling artist at the time and needed to be paid for his work. Morgan deliberately lied to Plaintiff and told him that Afropunk had no money to pay him because the festival was free, and "he made no money off it." He proceeded instead to pressure Plaintiff into surrendering his Photos for free for Defendant's use.

33.     He fed Plaintiff lines like the work was "too important to black culture to not allow Afropunk to use it" and that Plaintiff's contribution to the Afropunk website would be a "contribution to the wider social justice movement" as a means to appeal to Plaintiff's emotions and beliefs. Defendant Morgan also promised to help promote Plaintiff and that Plaintiff would be paid to photograph the festival.

34.     As it turns out, these were lies spun to wear Plaintiff down in order to get the work for free. Believing the lies and propaganda spoken by Defendant Morgan, Plaintiff gave in and agreed that Defendants could use six (6) images for their website only for the 2015 festival.  Plaintiff made clear that he retained all rights in the work.  In addition, Plaintiff requested that the website would credit and promote his work.  Morgan agreed to the terms.

8

35.     On May 14, 2015 the parties entered a verbal agreement that only six (6) pictures would be used, and that they would only be used on the Afropunk website. Defendant would credit Plaintiff with all the work used and Plaintiff would own all his rights. On May 21, 2015, Plaintiff received an email from Ms. Stays with images that she wanted and asked that they be sent to her in larger professionally usable sizes on Dropbox. The parties agreed on six pictures which were then sent to her.

36.     The next day, Morgan called Plaintiff asking if he could send more images via the Dropbox for them to choose from. Plaintiff reiterated that no matter how many photos were sent the agreement was only for a total of six to be used on the website. Morgan again reaffirmed his agreement.  On or about May 23, Plaintiff shared his 'Dropbox' with Defendants, which contained various photos to provide more options for the six as requested.  The Drobox included festival and non-festival works and contained over fifty (50) photos.

37.     In August 2015, Plaintiff was asked for additional photo work beyond the six images.  He was offered the chance to take photos during the festival, which would be posted to the daily Instagram page for the festival. The deal would pay $1,200, and required Plaintiff to provide Twelve (12) images. Plaintiff agreed on the condition that he retained all rights to his work and that they would not belong to Afropunk or any other party. Morgan agreed.

38.     On August 5, 2015 Plaintiff received a contract, via email, which did not match the verbal agreement that he entered with Morgan concerning use of his photographs. The agreement did not contain the reservation of rights that was agreed to.

9

39.     Plaintiff spoke to Andrea Dwyer head of PR for Afropunk and told her he would not sign the agreement because it did not reflect the verbal agreement entered with Morgan.  Dwyer spoke to Morgan who agreed that Plaintiff did not have to sign, and as a result it was never signed.  Plaintiff never waived his rights to his work given to Defendants.

40.     On August 22, 2015, Plaintiff showed up to the festival grounds to work and was met by a surprise.  When he arrived at the Afropunk fair grounds, he was shocked to see his art everywhere!  There were posters around the fairgrounds using Plaintiff's artwork. The festival brochure containing the program guide made extensive use of his artwork. In fact, Plaintiff's Photo was on the front cover.  The Photos were also liberally used in the booklet itself.

41.     In addition to the signage and promotional books, the staff were wearing tee-shirts that had a graphic print which was a blowup of one of Plaintiff's Photos.  Plaintiff was floored, as he did not agree to the wide and extensive use of his work beyond the website.

42.     From looking at what the Defendants had done, it was apparent that Plaintiff's work had become the theme of the festival and was the 'look and feel' behind the whole branding for the festival and not just the website. Annexed hereto as Exhibit "C" are Photos of the improper and non-consensual uses that were documented by Plaintiff. The first part of the exhibit are Photos of the uses at the 2015 Brooklyn Festival.

43.     Plaintiff also discovered that the festival was far from free, as it was $40 for a day pass, $70 for the weekend and $130 to $225 for a VIP ticket. Defendant Morgan blatantly lied to Plaintiff in stating

that he had no money to pay for the Plaintiff's art in an attempt to fraudulently induce the Plaintiff to

give his work for free. Taking the Defendants claim that 60,000 people attend the festival each year, the

revenue was significant.

44.     Defendants also breached their agreement by failing to credit the Plaintiff for the artwork that

was used. So, festival attendees did not know that the Photos were Plaintiff's work.  Because the

Plaintiff's photos were everywhere, Defendants' failure to credit him destroyed a major opportunity to

spread and enhance his reputation as a photographer and artist.

45.     Plaintiff confronted Defendants with his outrage immediately.  On August 23, 2015, Plaintiff

confronted Andrea Dwyer about the situation.  He indicated that Defendants had completely taken

advantage of him as a young and inexperienced artist. They used his work across multiple platforms

and in Defendants' media outreach and promotion, which went well beyond the agreement that was

entered.  None of which was paid for by Defendants.

46.     Dwyer advised Plaintiff to speak directly with Morgan about his complaints.  Plaintiff

confronted Morgan who admitted to using the work without consent, but claimed it was for Plaintiff's

benefit as he claimed that Plaintiff was "getting great exposure." Plaintiff pointed out that this was false

and misleading, as his name was not attached to any of the posters, t-shirts or the brochure. Any

'exposure' he was getting was minimal at best.

47.     Morgan tried to reassure Plaintiff and told Plaintiff that the issue would be rectified.  But it

wasn't and the failure to credit Plaintiff as the festival artist was never corrected.  It was clear that

11

Defendant tried to mollify Plaintiff, knowing that he was guilty of infringing the Plaintiff's work without paying.

48.     Defendants knew that Plaintiff's artwork was special and unique, so much so that they built the entire festival motif around it. By 'stealing' Plaintiff's work, Afropunk did not have to pay a Creative consultant, stylist, designer or branding consultant to create the 'look and feel' of their festival. A potential savings of hundreds of thousands of dollars. Nor, did they have to pay licensing fees to Plaintiff or a percentage of royalties on products sold using his images.

49.     In his meeting with Morgan, Plaintiff demanded that after the 2015 festival there would be no future use of the artwork. Defendant Morgan agreed; however, since Plaintiff had been paid to take pictures for the Instagram site he asked that the Photos for the Instagram account be sent, as they needed them. Plaintiff, being a starving artist could not afford to lose the $1,200, so Plaintiff sent his 12 pictures for the Instagram account.

50.     Thereafter, Defendants, requested they be allowed to choose from a wider pool. They requested additional Photos claiming the selection was not enough. So, again needing the money, Plaintiff sent them a total of at least 40 to choose from.

51.     After the festival finished Plaintiff was asked to Photograph the inaugural festival in Atlanta, Ga. to be held in September 2015.  Plaintiff turned down the offer. He no longer trusted Defendants based upon the exploitation of his photos to their considerable benefit and profit, coupled with the lies about not being able to pay him.

12

52.     Plaintiff, in September 2015, again exchanged communication with Morgan. He reiterated that he did not give consent for use any of his Photographs going forward. Morgan acknowledged Plaintiff's concerns and again stated they would not use the work going forward.

53.     Plaintiff planned to attend the Afropunk festival in August 2016. It is important as a Photographer to stay connected to the culture, so Plaintiff contacted Afropunk LLC to get a Photographer's pass. Afro Punk LLC denied Plaintiff a pass. This seemed unusual to Plaintiff, because of his work in 2015. He was also aware that other black Photographers had no trouble acquiring the pass.

54.     In August of 2016, Plaintiff reached out to Morgan personally to find out why? Morgan invented a false narrative as to why Plaintiff was not given a pass to the festival. The exchange made Plaintiff curious. So, in order to find out what was going on he bought a ticket and attended the festival with a friend.

55.     The Festival was held over several days at the end of August 2016. Plaintiff attended on the first day. He noticed that the 2016 Festival was different than the one in 2015. Plaintiff noticed right away that the cost per ticket went up, and there were a lot more corporate sponsors then in years prior. There seemed to be a lot more attendees as well.

56.     But once Plaintiff went to the festival grounds, he understood the real reason that Defendants did not want him there; the 2016 festival, like the one in 2015, used Plaintiff's Photos as a theme for the entire look and feel of the festival branding. His art was EVERYWHERE. It was on posters and

13

directional signs scattered all around the festival grounds. Once inside, Plaintiff discovered instead of a brochure featuring the Afropunk program he discovered that there was a phone App for that year's festival.

57.    Plaintiff downloaded the App onto his phone and discovered that his Photo art was the cover page of the art in the App store on Apple's website. Once one downloaded the app and opened it, Plaintiff's Photos we also part of the design of the app which was like the 2015 brochure except on your phone. Exhibit "C" contains all of these images.

58.    Plaintiff subsequently discovered that, in addition to displaying Plaintiff's Photos at the festival grounds, it was also used on social media and on webmail blasts sent out during the festival to the tens of thousands on the email lists. One of the Photos was part of the graphic design of the Instagram account used during the festival.

59.    Plaintiff understood why Defendants did not want him to come to the event as he would clearly see how they scandalously infringed his artwork and breached the agreement not to use it after the 2015 Brooklyn Festival. Plaintiff attempted to document the improper infringing uses of Plaintiff's artwork once he got to the festival grounds. However, a security guard recognized him and notified Defendants. Plaintiff was asked to wait in the VIP tent. After 20 minutes three other guards came and escorted him off the festival grounds.

60.    Near the exit, Morgan was waiting for Plaintiff. He told the guards to physically restrain Plaintiff and while they did that he grabbed Plaintiff's camera and searched for the Photocard. While

14

being physically restrained on the ground, Morgan searched Plaintiff and found the photo card. He removed the photo card and then had the guards manhandle Plaintiff out into the street in a rough and abusive manner. Plaintiff was extremely distraught being physically abused by the guards like a criminal.  The abusive episode was on top of the fact that of Plaintiff discovering that Morgan and the other Defendants stole Plaintiffs work to use for branding the Afropunk festival despite the express agreement not to use the art.  It was like a two body blows in the same day.

61.     Plaintiff went to the police station to report what happened, and they called Defendant on the phone. According to the police officer, Morgan claimed that Plaintiff had trespassed at the event, which was a lie as Plaintiff had paid for his ticket.

62.     Morgan told the Police that Plaintiff was taking illegal Photographs and had no press pass, so Morgan felt he had the right to confiscate the Photographs.   This was a blatant lie, however, the officer involved told Plaintiff that if he pressed charges for assault and theft, Morgan would also press charges for trespass. Since Plaintiff was already in the police station, he would be arrested. Deciding it was not worth spending several days in Police custody, although outraged at what had happened, Plaintiff did not press charges.

The police officers went to the festival to demand Morgan return Plaintiff's photo card. Morgan complied, however, while in possession of the photo card, Morgan had deleted all Plaintiff's images off the card, which included many other photos not related to Afropunk.

15

63.     Since Plaintiff was now barred from the festival, he had friends attend the festival and get

evidence.  Over the next year and a half, Plaintiff gathered information regarding the continued

infringement of his copyrighted works by Afropunk.  Photographs contained in Exhibit "C" are part of

the evidence to corroborate the continued infringement.


64.     Plaintiff's artwork continued to be the main thematic branding used by Afropunk in 2016 and

2017, and he believes it will the same for 2018 for their festivals in the USA and around the world.  It

was used on merchandise like tee-shirts.  Plaintiff's Photo was even used on a cover of a mix tape that

Afropunk was selling.  As far as Plaintiff can discover, the artwork was used in Atlanta, Johannesburg,

and London in the 2016 and 2017 festivals.  See, Exhibit "C".


65.     The Photos have been used for on-line promotions and marketing on the Afropunk Instagram

account, the Afropunk website and the other social media accounts like Twitter. See Exhibit "D".

Plaintiff's Photos have now become intertwined with the festival in the public's minds.  It is an

important element in the branding and appeal to the customer and fan base and a motif that cannot be

replicated by any other photographer.


66.     Already Plaintiff has discovered that Defendants are continuing to use Plaintiff's works with

abandon.  Annexed hereto as Exhibit "E" is an image from the Instagram feed for Afropunk podcasts

dated June 2018 using the Plaintiff's image.


67.     Annexed hereto as Exhibit "F" are screen shots showing Afropunk using Plaintiff images on

their Facebook page to advertise events related to the festival.

68.     However, the biggest damage to Plaintiff is that the public does not identify these beautiful images they love, with Plaintiff as the artist. These images have become iconic, especially in the black American community.

69.     To the extent the public is aware of Plaintiff, many have come to believe that Plaintiff has infringed the images from Afropunk and not the other way around.  An Artist's reputation is everything, and the fact that Defendants use these iconic works of art without crediting Plaintiff has caused and will continue to cause him irreparable damage to his reputation as an artist.

COUNT  I
COPYRIGHT INFRINGEMENT
(17 U.S.C. §§ 106 and 501)
(By Plaintiff Against Defendants)

70.     Plaintiff incorporates herein by this reference each and every averment contained in paragraphs 1 through 69, inclusive.

71.     Through their conduct averred herein, Defendants have infringed Plaintiff's copyright in the infringed Photographs in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501.

72.     Defendants' acts of infringement are willful, intentional and purposeful, in disregard of and with indifference to Plaintiff's rights.

17

73.     As a direct and proximate result of said infringement by Defendants, Plaintiff is entitled to damages in an amount to be proven at trial.

74.     Plaintiff is also entitled to Defendants' profits attributable to the infringement, pursuant to 17 U.S.C. § 504(b), including an accounting of and a constructive trust with respect to such profits.

75.     Plaintiff further is entitled to his attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and otherwise according to law.

76.     As a direct and proximate result of the foregoing acts and conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Plaintiff is informed and believes on that basis aver that unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff's rights in the Infringed Composition. Plaintiffs are entitled to preliminary and permanent injunctive relief to restrain and enjoin Defendants' continuing infringing conduct.

WHEREFORE, Plaintiff demands judgment:

A.      Preliminarily and permanently enjoining the Defendants, their agents, servants, employees, and attorneys and all those acting in concert with them from infringing Plaintiff's Copyrights in violation of 17 U.S.C. § 501, or using any of his artwork in any manner;

B.      Awarding Plaintiff his damages or Defendants' profits, or alternatively, at Plaintiff's election, statutory damages, as a result of defendants' willful infringement of the Plaintiff's Copyrights;

C.      Awarding Plaintiff his costs in this action, including their reasonable attorneys' fees pursuant 17 U.S.C. § 505; and

D.     Granting such other and further relief as to this Court seems just and proper.


Jury Trial Demand

PLEASE TAKE NOTICE that pursuant to Rule 38 of the Federal Rules of Civil Procedure, the

plaintiffs hereby demand a trial by jury of all issues that are so triable.

Dated:  New York, New York
        June , 2018


Respectfully submitted,
LAW OFFICE OF ROBERT L. GREENER


ROBERT L. GREENER ESQ(RG8089)
*Attorney for Plaintiff*
112 Madison Avenue, 6th Floor
New York, NY 10118
(646) 415-8920
(212)689-9680

19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

**MAMBU BAYOH,**

**Plaintiff,**

    -against-

**Civil Action No.**

**AFROPUNK FEST 2015 LLC, AFROPUNK LLC,**
**AFROPUNK GLOBAL INITIATIVE LLC, and**
**MATTHEW MORGAN, JOCELYN COOPER, and**
**JOHN DOE and JANE DOE 1-10 individually,**

**Defendants.**

_____X

## COMPLAINT

### ROBERT L. GREENER

Attorney for Plaintiff
112 Madison Avenue, 6th Fl.
New York, New York 10016
(646) 415-8920

Service of a copy of the within                is hereby admitted.

Dated:           _____

          Attorney(s) for

**PLEASE TAKE NOTICE:**
    _____**NOTICE OF ENTRY**
          that the within is a true copy of a Decision and Order of the Court
          entered in the office of the clerk of the within named court
    _____**NOTICE OF SETTLEMENT**
          that an Order of which the within is a true copy will be presented for settlement to the
          Hon.                     One of the judges of the within named Court,
          at
          on                 at
Dated:

**ROBERT L. GREENER**

Attorney for Plaintiff
112 Madison Ave., 6th Fl
New York, New York 10016
(646) 415-8920
