UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

MAMBU BAYOH,

                                     Case No. 1:18-cv-05820-DLC-KNF

                     Plaintiff,

      -against-

AFROPUNK FEST 2015, LLC, AFROPUNK LLC,
AFROPUNK GLOBAL INITIATIVE LLC, and
MATTHEW MORGAN, JOCELYN COOPER,
and JOHN DOE and JANE DOE 1-10 individually,

                 Defendants.

-------------------------------------------------------------------X

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. MICHAEL EINHORN

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Attorneys for Defendants
77 Water Street, Suite 2100
New York, New York 10005
212.232.1300

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................. 1

II.     STANDARD OF REVIEW ................................................................................................. 3

III.    ANALYSIS ......................................................................................................................... 4

IV.     THE EINHORN REPORTS ARE ADMISSIBLE ............................................................. 5

   a.    Dr. Einhorn Was Not Required to Provide Valuations as to Damages or Defendants'
   Profits Because Record Evidence Did Not Reveal Any Damages or Profits Attributable to
   Plaintiff's Photographs .................................................................................................................. 5

        i.    There is no evidence to support Plaintiff's theory that he is entitled indirect profits ...... 8

   b.    Plaintiff's Improper Survey Did Not Shift the Burden .................................................... 11

   c.    Dr. Einhorn Is Adequately Familiar With All Pertinent Documents In This Case .......... 15

        i.    Experts Can Rely On Data Provided by Counsel ........................................................... 16

        ii.   Dr. Einhorn is a Damages Expert, Not a Liability Expert .............................................. 17

V.      THERE IS NO BASIS TO EXCLUDE EINHORN'S SUPPLEMENTAL REPORT ......... 18

   a.    Plaintiff Waived Any Objection to Alleged Late Disclosure of Supplanting Report &
   Plaintiff Cannot Establish Any Prejudice from the contents of the Supplemental Report ....... 18

VI.     AFROPUNK'S CHIEF OPERATION OFFICER, ALLEN LAMB, IS QUALIFIED TO
   TESTIFY AS TO DEFENDANTS' FINANCIAL INFORMATION .......................................... 21

   CONCLUSION ........................................................................................................................... 22

i

## TABLE OF AUTHORITIES

**Cases**

*Antonick v. Elec. Arts Inc.*
  2014 U.S. Dist. LEXIS 7924, at *8 (n.3) (N.D. Cal. Jan. 22, 2014)......................................22
*Apollo Theater Found. Inc. v. W. Int'l Syndication,*
  02 Civ. 10037, 2005 U.S. LEXIS 7955 (S.D.N.Y. May 6, 2005)……………………………22
*Arista Records LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011)........................................................................... 13, 15, 18
*DaimlerChrysler Servs. v. Summit Nat'l,*
  2002 Civ. 71871, 2006 U.S. Dist. LEXIS, (E.D. Mich. Jan. 26, 2006) ........................ 9, 11, 12
*Childress v. Taylor,*
  798 F. Supp. 981, 991-92(S.D.N.Y. 1992)…………………………………………...……....22
*Fahmy v. Jay Z,*
  2007 Civ. 05715, 2015 U.S. Dist. LEXIS 129446, *1-2
  (C.D. Cal, Sept. 24, 2015) .............................................................. 13, 15, 16, 21, 22
*IBM V. BGC Partners, Inc.,* 10 Civ. 128, 2013 U.S. Dist. LEXIS 59779 at *9 (S.D.N.Y. Apr.
  25, 2013) ....................................................................................................... 3, 8, 9, 22
*Koppel v. New York State Bd. of Elections*,
  97 F. Supp. 2d 477 (S.D.N.Y. 2000)...................................................................................... 3
*Lee Valley Tools, Ltd. V. Indus. Blade Co.*,
  288 F.R.D. 254, 267 (W.D.N.Y. 2013) .................................................................................. 19
*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp.2d 558 (S.D.N.Y. 2007)..................................................................................... 2
*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
  271 F. Supp. 2d 737 (D. Md. 2003) ................................................................................... 6, 8
*Mager v. Brand New Sch.*,
  03 Civ. 8552, 2004 LEXIS 21686 (S.D.N.Y. Oct. 28, 2004) ................................................. 8
*Mango v. Buzzfeed, Inc.*,
  17 Civ. 6784, 2018 U.S. Dist. LEXIS 123770 at **7-8 (S.D.N.Y. July 19, 2020) .................. 2
*Mercy v. County of Suffolk*,
  748 F.2d 52, 55 (2d Cir. 1984) ............................................................................................. 20
*Olive v. General Nutrition Centers, Inc.*,
  30 Cal. App. 5th 804, 819 ...................................................................................................... 2
*On Davis v. Gap, Inc.*,
  *246 F.3d 152 (2d Cir. 2001)*....................................................................... 6,7,8,21,22
*Real View LLC v. 20-20 Technologies, Inc.*,
  878 F. Supp. 2d 282, 284 (D. Mass. 2012)............................................................................ 2
*Reinsdorf v. Skechers U.S.A.*,
  922 F. Supp. 2d 866 (C.D. Cal. Feb. 6, 2013)……………………………………………13, 14
*Semerdjian v. McDougal Littell*,
  641 F. Supp. 2d 233 (S.D.N.Y. 2009).................................................................................... 8
*Solid Oak Sketches, LLC v.*
  *2K Games, Inc*., 2016 Civ. 724, 2020 U.S. Dist. LEXIS 53287, (S.D.N.Y., March 26,
  2020) ............................................................................................................................. 13, 16
*Sunset Lamp Corp. v. Alsy Corp.*

88 Civ. 8443, 1990 U.S. Dist. LEXIS 13997, at *6 ................................................................ 8

*Taylor v. Meirick,*
712 F.2d 1112, 1122 (7th Cir. 1983)…………………………………………………………..22

*Zarema v. GMC,*
360 F.3d 355 (2d. Cir. 2004)................................................................................................ 3

## **<u>Rules</u>**

Fed. R. Civ. P. Rule 26(2)(D) ................................................................................. 21
Fed. R. Evid. 702 ................................................................................................... 3

Defendants Afropunk LLC, Matthew Morgan, and Jocelyn Cooper ("Defendants"), by their undersigned attorneys, submit this memorandum of law in Opposition to the Daubert Motion filed by Plaintiff that seeks to exclude the expert testimony of Dr. Michael Einhorn, (D.E. #135-136).

## I.   <u>INTRODUCTION</u>

Pending before the Court are Defendants' own Daubert Motion to exclude Plaintiff's experts Robert Wallace and Weston Anson, (D.E. #137), and Defendants' Omnibus Motion *In Limine* (D.E. #138).   The underlying damage-related issues and arguments subject to these pending motions are precisely why Dr. Einhorn actually cannot be excluded.[1]   As articulated in Defendants' pending motions, Plaintiff improperly shifts the initial burden of causality in considering copyright damages in this case.   As background, Plaintiff seeks to solicit the testimony and reports of his experts, Wallace and Anson, to support his basis for actual damages and disgorgement of profits; he does not seek to present actual damages via Plaintiff himself. See (D.E. #127 at p. 3 ("While statutory damages are no longer part of the case, the Plaintiff still has the right to lost profits, actual damages or disgorgement of profit from Defendants under the Copyright Act. Plaintiff has obtained experts to present the damages portion of the case, and reports have been exchanged by the parties.").   Plaintiff's counsel doubled-down on this strategy at the Court's pretrial teleconferences on October 22 and 23, acknowledging he is seeking to prove actual damages via his two experts.

---

[1] Defendants note that they retained Dr. Michael Einhorn to provide an expert opinion with respect to damages.  Dr. Einhorn provided two reports in this case: (i) a report dated February 14, 2020 ("Initial Report") and (ii) a supplemental report dated, March 23, 2020 ("Supplemental Report").  On October 9, 2020, Dr. Einhorn prepared an amended report for the "Initial Report" and "Supplemental Report" only for the purposes of fleshing out the full list of documents that he had reviewed throughout the cases. Dr. Einhorn's deposition was held via remote video-conference on October 8, 2020 ("Einhorn Tr.").

Plaintiff's motion to exclude Dr. Einhorn, Defendants' expert, is based upon several fallacies.  First, Plaintiff accuses Dr. Einhorn of not knowing "the facts of the case." (D.E. #136, Pl.'s Br. at p. 10).  But Dr. Einhorn was not disclosed as an expert on behalf of the Defendants as any fact – or liability – expert.  He was disclosed for his many decades of experience serving as a "damages" expert in over thirty copyright cases.  Dr. Einhorn's job was actually to assume facts and liability – not be a master of them.  Defendants did not retain Dr. Einhorn for the purpose of verifying or assessing any particular fact or liability issue.

Second, Plaintiff argues that Dr. Einhorn failed to provide any substantive analysis, including aiding the Defendants' burden in apportionment or in offsetting any allegedly infringing profits at issue.  This is not true.  Dr. Einhorn reviewed the relevant documentation from discovery produced in this case, inclusive of certain photographs of Plaintiff that Defendant Afropunk used, as well as certain financial records of Afropunk.  But none of this evidence credibly supported any direct sale or offer for sale of any advertising-related revenue or profits attributable to Afropunk.  Plaintiff theorizes his damages based upon two trademark experts analyzing indirect and unrelated revenue streams of Defendant Afropunk (vis-à-vis its use of Plaintiff's photographs, which he believes was permissible via a license).  Plaintiff's motion is fundamentally flawed in that it improperly attempts to "point the finger" at Dr. Einhorn for Plaintiff's own failure to fulfill its causality-burden obligation.

What is left of Plaintiff's damages are speculative, indirect sales allegedly attributable to Afropunk's revenue.  But as this Court has stated countless times, permitting a jury to hear general financial information of an alleged infringer should be excluded.  *Mango v. Buzzfeed, Inc.* 17 Civ. 6784, 2018 U.S. Dist. LEXIS 123770, at **7-8 (S.D.N.Y. July 19, 2020) (holding that evidence of BuzzFeed's total net worth was not relevant and learning the company's total net

2

worth would not helpfully inform a damages calculation); *see also IBM V. BGC Partners, Inc.,* 10 Civ. 128, 2013 U.S. Dist. LEXIS 59779, at \*9 (S.D.N.Y. Apr. 25, 2013) (permitting "indirect profits claims" to a "jury should be extremely rare"). As such, Dr. Einhorn *could not* offset any allegedly infringing profits in this case because *there were none.*

Finally, Plaintiff's two trademark experts rendered conclusions that were speculative and made it considerably difficult for Dr. Einhorn to respond.[2]  Faced with often confusing and incorrect methodologies applied by Plaintiff's two trademark experts,[3] nonetheless Dr. Einhorn rendered a fair and reasonable opinion.  (*See* Einhorn Affidavit, attached herein).  Plaintiff has failed to provide any basis that warrants the exclusion of Dr. Einhorn's testimony or reports at trial.  Defendants respectfully request that this Honorable Court deny Plaintiff's Daubert Motion.

## II.     STANDARD OF REVIEW

Under Fed. R. Evid. 702, a "witness who is qualified as an expert by skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or date;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

---

[2] Notably, Mr. Anson has been excluded in at least three cases.  *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.2d 558, 573 (S.D.N.Y. 2007) (excluding Anson in part as there were a "number of serious flaws that plague[d his] report and testimony"); *Real View LLC v. 20-20 Technologies, Inc.*, 878 F. Supp. 2d 282, 284 (D. Mass. 2012) (striking Anson's expert opinion as "the [] agreements he reviewed are not comparable and do not adequately support his opinions"); *Olive v. General Nutrition Centers, Inc.*, 30 Cal. App. 5th 804, 819 (affirming lower court's conclusion that "there was simply too great an analytical gap between the supposed data relied on by Anson and the opinion proferred").

[3] Defendants characterize Wallace and Anson as "trademark experts" given their extensive expertise in serving as experts in trademark cases (not copyright cases).  Wallace in particular acknowledged in his deposition testimony that almost all of his cases cited in his Curriculum Vitae were trademark cases.  A quick review of both experts' background readily identifies they are, indeed, trademark-focused experts (or they certainly have most experience in being involved in trademark specific cases).

The party proffering the expert has the burden to demonstrate that its expert witness satisfies these criteria. *See, e.g., Koppel v. New York State Bd. of Elections,* 97 F. Supp. 2d 477, 479 (S.D.N.Y. 2000) ("the burden of demonstrating that the testimony is competency, relevant, and reliable rests with the proponent of the testimony); *Zarema v. GMC*, 360 F.3d 355, 358 (2d. Cir. 2004).

In *Daubert Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993), the Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Id*. at 589. The Court must act as a gatekeeper, ensuring that an expert's expert opinion have a reliable basis in the knowledge and experience of his discipline. *Id*. at 592. This analysis requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592–93. Among the list of non-exhaustive factors that trial courts may consider in determining whether an expert's reasoning and methodology are reliable are: (1) whether the theory or technique on which the expert relies has been or could be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has been generally accepted in the scientific community. *Id*. at 593-94.

## III.   <u>ANALYSIS</u>

Plaintiff does not actually dispute that Dr. Einhorn is qualified, by virtue of his background and experience, to testify in this matter. Dr. Einhorn has extensive experience in intellectual property and economics. Dr. Einhorn received a B.A. from Dartmouth College, a Ph.

D. in economics from Yale University, and is the author of "*Media, Technology, and Copyright: Integrating Law and Economics.*"  (Einhorn Report, Appendix A).  In addition, Dr. Einhorn is also a former professor of economics at Rutgers University and he is the author of seventy professional and academic articles related to intellectual property and economic analysis. *Id*.

Because Plaintiff cannot contest Dr. Einhorn's palpable qualifications, Plaintiff raises unavailing arguments as to why Dr. Einhorn should be excluded.   Most notably, Plaintiff attacks Dr. Einhorn and his report for the *failure* to provide valuations of damages or of Defendants' profits.  (Pl. Br., 9).  Next, in an interesting strategy, Plaintiff attempts to resurrect his experts' opinions by arguing they employed proper methodology in reaching their conclusions.

## IV.    THE EINHORN REPORTS ARE ADMISSIBLE

### a.  Dr. Einhorn Was Not Required to Provide Valuations as to Damages or Defendants' Profits Because Record Evidence Did Not Reveal Any Damages or Profits Attributable to Plaintiff's Photographs.

A significant portion of Plaintiff's motion attacks Dr. Einhorn and his reports for the failure to provide valuations as to damages or Defendants' profits. (D.E. #136, Pl.'s Br. at pp. 4-10).  From the outset, there are no damages to analyze as to Defendants Morgan and Cooper as they did not engage in any activity outside the scope of their employment with Afropunk, LLC. In any event, and as will be discussed in this section, Dr. Einhorn was not required to provide an opinion on the shifting apportionment burden of Defendants because he could not do so based on the record evidence, i.e., Plaintiff failed its initial burden of demonstrating causality.  In pertinent part, Dr. Einhorn's Supplemental Report unambiguously provides:

> 4.3)    To recover damages, copyright Plaintiffs must first meet evidentiary burdens regarding proof of causality, and terms of valuation.

5

4.4)    Plaintiff fails to meet the evidentiary burden to prove the terms of financial remediation for the works in questions.

5.4)    Plaintiff generally bears four burdens in proving this remedy claim.

5.5)    First, Plaintiff must establish a *causal connection* between the defendant's infringement and any sought valuation of actual damages.

5.6)    Second, plaintiff bears a similar burden to share a causal connection between infringement and Defendant profits that he would disgorge.

5.7)    Third, Plaintiff must reliably prove actual damages based on presented evidence and testimony.

5.8)    Fourth, Plaintiff must prove defendant revenues resulting *from the infringing activity itself*.  It is not sufficient to include all revenues earned in the time period.  Once revenues are proven, Defendant bears the obligation to prove offsetting costs.

5.9)    I have read the Expert Reports of Robert Wallace and Weston Anson.  I believe that plaintiff generally fails to meet his burden regarding proof of causal connections, actual damages and defendant revenues.

(D.E. #134-4, Einhorn Supplemental Report at pp. 4-5).  Throughout the course of this litigation, Plaintiff has failed to demonstrate a causal nexus between the allegedly infringing conduct and the alleged infringer's gross revenue.  *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 751 (D. Md. 2003).  In his brief, Plaintiff incorrectly provides, "[u]nder the Copyright statute, Plaintiff needs to show only the gross profit of the infringer."  (D.E. #136, Pl.'s Br. at 6).  Plaintiff goes further and cites to the seminal case of *On Davis v. Gap, Inc.,* 246 F.3d 152 (2d Cir. 2001) - a case that was actually mentioned to Plaintiff's counsel first by Dr. Einhorn himself in his expert testimony; the following dialogue transpired at Dr. Einhorn's deposition:

A:   Here's my conclusion.  As I'm advised of the law, plaintiff bears the obligation to prove actual damages and . . . revenue arriving from the infringement.  Plaintiff bears that burden.  Plaintiff must then present a causal connection between dollars.  Plaintiff must break out – plaintiff cannot just say these are infringements, we get every dollar.  You can't put up the cash register.  You have to break out the people who bought their tickets because of the infringement and those people who would have gone to the concert anyhow?

Q:   Where does it say that in the law?  And if not, can you cite me a case that says we had to breakout that information?

***

A:   I believe there are cases, but that's a legal matter.

Q:   No.  You made a statement, and I would like to know what support you have for the statement.  Your [sic] an expert.  You should know what legal or criteria or industry criteria would support your statement and I would like to know what the basis of that statement is.

***

A:   If you can go back to the website of the Copyright Society, the USA, if you go to the journal of the Copyright Society, you will find that I wrote in 2015 an article entitled the causal connection, []which is about a 40-page article where I gave a bunch of legal references, law cases that I regarded to be – that regard to establishing the causal connection.  All [of] these cases are cited back to the case law.

Q:   Okay.  Dr. Einhorn [sic], since you already have that and you've done it, I'm asking you to cite on here that supports your position.

A:   On Davis versus the Gap.

Q:   On Davis versus the Gap, do you have the cite?

**Mr. Goins:** On Davis versus Gap, Second Circuit, a very popular case on damages, actually, Mr. Greener.

7

(D.E. # 134-5, Einhorn Tr., 149:19 – 150:25, 153:5 – 154:4).[4]

Plaintiff now pivots and seems to agree that *On Davis* added an additional step to the damages analysis – "Plaintiff needs to also show that gross profits are 'reasonably related' to the infringement, and not to unrelated revenues."  (D.E. #136, Pl. Br. at p. 7 (citing *On Davis*)). Plaintiff further provides, "indirect profits are still 'legally cognizable **if** the copyright owner can provide sufficient proof of a causal nexus' to the infringement."  (Id.) (citing *Complex Sys. Inc.*). Despite now recognizing Plaintiff's causality burden, Plaintiff's motion still chastises Dr. Einhorn for not providing analysis in this regard.  In *On Davis*, the Second Circuit construed the statutory term "gross revenue" to mean, "gross revenue reasonably **related to the infringement, not unrelated revenues**." *On Davis*, 246 F.3d at 160 (emphasis added). Since *On Davis*, the Court has repeatedly explained that the burden is on copyright owners to "make a showing of causation – i.e., that the use of the copyrighted work reasonably resulted in gross revenues, and ultimately the profits it seeks to disgorge." *Semerdjian v. McDougal Littell*, 641 F. Supp. 2d 233, 244 (S.D.N.Y. 2009); *Sunset Lamp Corp. v. Alsy Corp.* 88 Civ. 8443, 1990 U.S. Dist. LEXIS 13997, at *6 ("actual damages must bear a 'necessary, immediate and direct causal connection' to the defendant's infringement") (other citation omitted). *Mager v. Brand New Sch.*, 03 Civ. 8552, 2004 LEXIS 21686, at *4 (S.D.N.Y. Oct. 28, 2004).

### i.   There is no evidence to support Plaintiff's theory that he is entitled indirect profits

Plaintiff's argument that he is entitled to introduce arguments and evidence concerning indirect profits in this case is foreclosed by the Court's decision on a motion *in limine* in *BGC*

---

[4] Plaintiff's line of questioning is yet one example of counsel's improper attempt to ask Dr. Einhorn about topics that go beyond the scope of his disclosure.  Dr. Einhorn was not disclosed as a "legal" expert, so Defendants were at a loss to understand why Plaintiff's counsel would be asking Dr. Einhorn about legal citations.  In any event, Dr. Einhorn's understanding of the causality burden in copyright damages is well supported by extensive case law. *See* (D.E. #138 at pp. 6-15).

*Partners*, 2013 U.S. Dist. LEXIS 59779, as well as by many other cases, including the decision of the Eastern District of Michigan in *DaimlerChrysler Servs. v. Summit Nat'l*, 2002 Civ. 71871, 2006 U.S. Dist. LEXIS, (E.D. Mich. Jan. 26, 2006).

In *BGC Partners*, IBM sued BGC Partners for copyright infringement arising out of BGC's allegedly unauthorized use of IBM's trade processing software. *Id.* at *1, 3. The record was clear that BGC's customers neither knew nor cared what software BGC used to process their transactions. *Id.* at *3, 4. The record also was clear that BGC never marketed or sold the software to its customers. *Id.* at *4. Notwithstanding that, IBM argued that it was entitled to $100 million in indirect profits simply because BGC used IBM's software in its back-office and because BGC personnel believed that the software was an important component of BGC's back-office operations. *Id.* at *4.  The Court rejected IBM's claim and excluded evidence of indirect profits because IBM had not met its burden of showing that there was a causal relationship between BGC's use of the software and the indirect profits generated in BGC's business.

The Court's opinion is directly on point to this case, and demonstrates that Plaintiff cannot offer arguments and evidence of indirect profits from Afropunk's business at trial, or seek to exclude Dr. Einhorn for his alleged failure to do Plaintiff's job.  The Court in *BGC Partners* found that IBM had not met its burden of introducing gross revenue "reasonably related" to the infringement and therefore was precluded from introducing evidence of indirect damages at trial because, among other things, IBM sought to introduce "revenue that was not derived from the infringement itself." *BGC Partners*, 2013 U.S. Dist. LEXIS 59779, at *4. Here, Plaintiff's indirect profits theory suffers from the same defect.  Plaintiff's damages expert, Weston Anson, opines that more than $13,000,000 of Afropunk's revenue is subject to disgorgement simply because Afropunk used Plaintiff's photography for promotional purposes. (D.E. #134-6, Anson

Report at p. 7).  In doing so, "Mr. Anson fails to consider other factors that would have led consumers to purchase Afropunk tickets or merchandise, including all of the other photographs and artists related the event who would have had a considerable share in the causation." (D.E. #134-4, Einhorn Supp. Report at p. 14).  Afropunk does not advertise or sell the works of "Mambu Bayoh" to its customers, and Plaintiff has failed to provide any evidence that any sales made were attributable to any of the twenty-eight copyrighted photographs of Plaintiff.  *See, e.g., BGC Partners*, 2013 U.S. Dist. LEXIS 59779, at *4 (internal quotation marks omitted) (recognizing that courts often deny recovery if the profits are only remotely or speculatively attributable to the infringement").

In *DaimlerChrysler,* the court held that, to the extent that the plaintiff could recover indirect profits, the plaintiff would have to do more than "point to [Defendants'] balance sheet" to "make a threshold showing of the nexus between [plaintiff] and those profits generated by the infringement of [the product]." *DaimlerChrysler*, 2006 U.S. Dist. LEXIS 4282, at *4. In reaching its decision that there is a heightened burden on a copyright owner seeking indirect profits, the Court explained that:

> [A]lthough it could not likely have carried on business without [Plaintiff] (or some suitable substitute), it does not follow that every cent of profit [Defendant] generated was attributable to [Plaintiff]. Its analogy is helpful in this respect: Defendant could not operate without its toilets either, but that does not mean that all of its profits are attributable to commodes.
>
> ***
>
> In the absence of direct mandatory authority, the Court is persuaded by those cases placing a heightened burden on the copyright holder where profits are indirect.

*Id*. at *3, 4. Judge Crotty relied on the *DaimlerChrysler* decision when he held that IBM could not obtain indirect profits from BGC's use of the software. *BGC Partners*, 2013 U.S. Dist.

LEXIS 59779, at *4, n.7.  Given the foregoing, because Plaintiff failed to demonstrate a causal connection between his photographs and Afropunk's profits, the burden did not shift and Dr. Einhorn was not required to demonstrate apportionment or off-setting costs to Defendants' gross profits in general.

### b.  Plaintiff's Improper Survey Did Not Shift the Burden.

Plaintiff attempts to exclude Dr. Einhorn by juxtaposing Dr. Einhorn's reports with the "detailed analysis" in Robert Wallace's report. This argument is unavailing. As stated in Defendants' Daubert motion, Mr. Wallace is not a qualified expert in the field of copyright infringement. Additionally, the survey conducted by Mr. Wallace, which is the primary basis of his opinion, is misplaced in the context of copyright infringement. Because Dr. Einhorn's reports are not as "detailed" as Mr. Wallace's wholly misguided report is no basis for exclusion.  As Plaintiff so elegantly points out in his motion, "surveys are most often used in trademark and trade dress cases" – not copyright cases.  (D.E. #136, Pl. Br. at p. 8).

Plaintiff cites to four cases to support his assertion that the Wallace Survey is proper in this context; none of these cases support Plaintiff's argument.  Two of the four cases concern sound recordings and musical copyrights. (*Arista Records LLC v. USENET.com* and *Fahmy v. Jay-Z).*  One case concerns the use of NBA players' tattoos in a videogame.  (*Solid Oak Sketches, LLC. v. 2K Games, Inc.)* The fourth and final case cited by Plaintiff concerns a limited license and the use of photographs for marketing promotions.

Confoundingly, Plaintiff cites to *Reinsdorf v. Sketchers U.S.A.*, 922 F. Supp. 2d 866 (C.D. Cal. 2013) in support of his assertion that survey evidence can be used in a copyright case. (Pl. Br., 8-9).  In a parenthetical, Plaintiff contends "[s]urvey evidence allowed in infringement

action of copyrighted photograph used in marketing by shoe company." (Pl. Br., 9).  *Reinsdorf* does not stand for this proposition, however, as *Reinsdorf* actually supports Defendants' position in this case.  In *Reinsdorf*, plaintiff was hired by Sketchers to conduct several photo-shoots.  *Id.* at 870.  Plaintiff would provide Sketchers with photographs at the end of each photo-shoot; Sketchers would take the images, modify them and proceed to use them in their advertisements. *Id.*  Plaintiff submitted invoices to Sketchers for his services and contended that he granted Sketchers a limited license to use the photographs; plaintiff brought a suit alleging Sketchers utilized his copyrighted images as part of Sketchers' marketing efforts in violation of the temporal and geographic limits of the use licenses. *Id*. at 3.

The plaintiff in *Reinsdorf* alleged that the "bulk of the images' appeal can be attributed to [his] photos and quantified."  *Id.*  at 10.  Plaintiff attempted to defeat Sketchers' motion for summary judgment with the use of a brand recognition survey.  *Id.* at 11.  The survey was designed to test whether plaintiff's photographs were directly linked to the Sketchers brand and whether plaintiff's photographs influenced consumers' decision to purchase a product. *Id.*  The Court held "the preponderance of the evidence indicates that the [] survey was not conducted according to accepted scientific principals…the survey purported to examine the role that plaintiff's photos played in consumers' association of certain ads with Sketchers brand, the survey did not include any controls or basis for comparison." The Court proceeded, "[t]hese inadequacies speak not merely to the weight that should be accorded to the survey, but rather to the fundamental reliability of [the expert's] approach.  Plaintiff did not identify any scientific principles underlying the [] survey, which appears to violate numerous accepted practices in the field of survey research."  *Id.* at 28-29.  The Court summarily excluded the expert's report and testimony and ultimately granted Sketchers' motion for summary judgment.

Here, Plaintiff's own case actually furthers why this Court must exclude Mr. Wallace's consumer survey expert (and why Dr. Einhorn was not required to rebut it per se). The fact that Plaintiff felt compelled to cite a case where the Court excluded a plaintiff's "brand recognition survey" further supports Defendants argument that the Wallace Survey is misplaced in this case. Plaintiff does not identify a single case wherein a federal court accepted the type of survey used by Wallace in a copyright infringement matter. Accordingly, as Plaintiff failed to establish a causal connection between the infringed work and Afropunk's profits, the burden did not shift and Dr. Einhorn was not required to provide a valuation of damages or Defendants' profits.

In *Arista*, the plaintiffs were recording companies and the defendants maintained a service that allowed their subscribers access to unlimited downloads of the plaintiffs' copyrighted sound recordings without plaintiffs' authorization. *Arista Records LLC v. USENET.com* 2009 U.S. Dist. LEXIS 55237,129, 633 F. Supp. 2d 123 (S.D.N.Y. June 30, 2009). The primary function of defendants' service was to provide its users with the ability to download songs. *Id.* at 130. A statistical survey was developed, "for the purpose of estimating the proportion of infringing content files available in certain music newsgroups on Defendants' service." *Id.* at 144. "The survey showed that 42% of responding subscribers identified downloading music files as a 'primary' reason they use [d]efendants' service." *Id.* at 134. The court further provided, "the undisputed facts in this case indicate that Defendants openly and affirmatively sought to attract formers users and other notorious file-sharing services." *Id.* at 152. Unlike *Arista*, there is no credible evidence in this case that Defendants' sought to hold Plaintiff's work out as *the* main attraction of Afropunk's business. In fact, the record evidence is plentiful with extensive advertising of the Afropunk festival that did not include or promote or

use Plaintiff's photographs, inclusive of music artists' line-ups of popular performers such as Lenny Kravitz, Janelle Monae, Jill Scott and Lauryn Hill.

In *Fahmy*, a consumer survey was used in a case wherein plaintiff claimed that defendant, Jay-Z's song *Big Pimpin'* infringed on his rights to his song, *Khosara. Fahmy v. Jay Z*, 2007 Civ. 05715, 2015 U.S. Dist. LEXIS 129446, *1-2 (C.D. Cal, Sept. 24, 2015).  A consumer survey was conducted for the purpose of determining whether the song *Big Pimpin'* contributed to consumers purchasing tickets for Jay-Z concerts. *Id*. at 59.  The *Fahmy* survey specifically asked respondents questions about Jay-Z concerts over the past ten years. *Id.* at 61.  It goes without saying, but Plaintiff, Mambu Bayoh, is not Jay-Z.  Jay-Z is a well-known and highly accomplished artist.[5]  Unlike Jay-Z and the identifiable song *Big Pimpin*', neither Plaintiff nor Plaintiff's works are recognizable.  In part, the *Fahmy* survey asked respondents if they attended events "because of [the song]" – but the Wallace Survey simply provides conjecture that Afropunk's prospective consumers would be influenced by Plaintiff's photography based on a question of how likely responders are to attend an event based on observing a few remote photographs.  (D.E. #134-1, Wallace Report at pp. 2, 18, 26).  The Wallace Report/Survey includes no direct evidence of anyone whom purchased a ticket, or would purchase a ticket, to an Afropunk Festival as a result of the use or display of any of Plaintiff's copyrighted photographs.

In *Solid Oak Sketches, LLC v. 2K Games, Inc.*, plaintiff alleged that defendants infringed its copyrights by publicly displaying tattoos for which it owned licenses, that are depicted on certain NBA players.  2020 U.S. Dist.  LEXIS 53287 (S.D.N.Y. March 26, 2020).  Defendants utilized a survey to show "why consumers purchased [the videogame]…and to what extent, the

---

[5] Throughout his career, Jay-Z has been awarded 22 Grammy Award from 77 nominations.  RECORDING ACADEMY GRAMMY AWARD, *Jay-Z*, https://www.grammy.com/grammys/artists/jay-z/9815  (last visited Oct. 20, 2020).  The song that was the subject of the infringement in *Fahmy* was an extremely popular track that was nominated for a Grammy Award in 2000.

Tattoos drove consumer demand for the game." *Id.* at 36.  The survey data was used in the expert providing his opinion that: (i) none of the profits associated with the video game were attributable to the Tattoos, as a result plaintiff has not been damaged by defendants' alleged infringement; (ii) there is currently no market for licensing tattoo artwork, and (iii) such market is unlikely to develop." *Id.* at 42.  Unlike the survey used in the instant case, Mr. Wallace's survey failed to measure "why consumers purchased Afropunk tickets or memorabilia."  Mr. Wallace's survey merely juxtaposed two sets of photographs with one another and determined which set received more positive feedback.  And unlike in *2K Games*, Defendants here do not believe proving non-infringing factors was required because, again, the causality burden never shifted from Plaintiff to the Defendants.

### c. Dr. Einhorn Is Adequately Familiar With All Pertinent Documents In This Case.

Plaintiff attempts to discredit Dr. Einhorn's reports and testimony by stating Dr. Einhorn provided self-serving legal conclusions that are "well beyond [Dr.] Einhorn's admitted qualifications."  (Pl. Br. 9). Further, Plaintiff disingenuously states, "what emerges from review of the Einhorn's report and testimony, it [sic] that he did not know the facts of the case." (Pl.'s Br. at p. 9). Plaintiff provides a lengthy (300 plus word) footnote in which he states Defendants' counsel "improperly coached is witness to claim to remember certain documents which Einhorn clearly failed toe recall despite the initial report being drafted only 10 months prior."  (Pl.'s Br. at 9). Conveniently, Plaintiff fails to inform the Court about the utter chaos that permeated the October 8, 2020 Einhorn deposition. Because Plaintiff's counsel did not apprise Defendants of the deposition vendor's nuanced platform, there was a great deal of frustration for everyone involved, including Dr. Einhorn. Most notably, Dr. Einhorn experienced issues in connecting to the virtual deposition, and being able to view exhibits.

The deposition was noticed to begin at 10:00 a.m., however it did not begin until 10:29 a.m. due to technical difficulties. (D.E. #134-5, Einhorn Tr. at p. 4:2-3). Shortly thereafter, Plaintiff's counsel attempted to show Dr. Einhorn an exhibit, but was unable to do so. Plaintiff's counsel stated, "[m]y understanding is [the exhibit] should be marked, according to the tutorial that I worked with yesterday." (Id. at 10:13-16). A twenty-one minute recess was held to address the issue. (Id. at 11:11-17). These technological issues persisted for the duration of the deposition. For example, at approximately 3:30 p.m. Plaintiff's counsel asked Dr. Einhorn a question and immediately remarked, "[Dr. Einhorn] I can't hear you. I can't hear you. I can't hear you." (Id. at 180:2-11). Understandably, the chaotic nature of the deposition reasonably could have led to Dr. Einhorn potentially hesitating as to exactly what specific documents he reviewed per se. In the interest of providing a clear record, however, Defendants' counsel attempted to question Dr. Einhorn at the conclusion of Plaintiff's counsel's questioning. (Id. at 181). Dr. Einhorn testified that he was going to amend his document list to help clarify which documents he reviewed in preparation of his initial report. (Id. at 181:25-182:2). Immediately after the deposition, on October 9, 2020, Dr. Einhorn updated the documents he reviewed in preparation of his reports. (See Exhibit A filed herewith, Einhorn's Amended Reports at p. 3).

### i. Experts Can Rely On Data Provided by Counsel.

Plaintiff claims that Dr. Einhorn's opinion is excludable because he relied upon information provided by counsel. (Pl. Br. at p. 4). This is incorrect. "Experts may rely upon information provided by the client, other experts, or counsel." *See Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 413 (S.D.N.Y. 2011). Indeed, even if some of the information provided by the party is unverified or inaccurate – which Defendants do not contend is the case here – such errors would go to the weight of the expert's opinion, not its admissibility. *See Lee*

*Valley Tools, Ltd. V. Indus. Blade Co.*, 288 F.R.D. 254, 267 (W.D.N.Y. 2013) ("an expert opinion is no per se unreliable because it relies upon some unverified or inaccurate information provided by the expert's client.").

### ii.   Dr. Einhorn is a Damages Expert, Not a Liability Expert.

Unnecessarily, Plaintiff's counsel spent a signification portion of the Einhorn deposition questioning Dr. Einhorn about documents Dr. Einhorn reviewed and specific facts of the case. Plaintiff disingenuously contends, "Dr. Einhorn did not review all pertinent documents in the case in reaching his conclusions and instead relied on information relayed to him solely by opposing counsel." (Pl. Br. at p. 4).[6]  Whether Dr. Einhorn was able to pass Plaintiff counsel's arbitrary memory test is of no significance.  The subject of Dr. Einhorn's testimony in this case is abundantly clear – Dr. Einhorn is being offered to testify as a damages expert.

Defendants' Expert Disclosure provides "Defendants expect Mr. Einhorn to testify as a damages expert." (D.E. #134-3, Defendants' Expert Disclosure).  Dr. Einhorn's reports provide, "I have been asked…to provide my expert valuation of any applicable actual damages claimed by Plaintiff."  (D.E. #134-3, Einhorn's Initial Report at p. 2; D.E. # 134-4 Einhorn's Supp. Report, 2).  Moreover, at Dr. Einhorn's deposition, defense counsel attempted to remind

---

[6] On October 9, 2020, Dr. Einhorn provided a supplemental report, identifying "a more detailed accuracy of the documents that [he] reviewed leading up to the preparation of the [February 14, 2020 report."  The list of documents reviewed provides: (i) Plaintiff's Amended Complaint, including exhibits; (ii) Order & Opinion on Summary Judgment, Southern District of New York, January 15, 2020; (iii) Expert Report of Rob Wallace, including exhibits and appendixes; (iv) Defendants' interrogatories and request for production and Plaintiff's responses thereto; (v) Plaintiff's interrogatories and request for production and responses thereto; (vi) Financial records of Afropunk, LLC; (vii) Standard photographers' releases used by Defendants; (viii) Defendants' Rule 56.1 statement in support summary judgment motion; (ix)   *https://www.asmp.org/professional-development/licensing-guide/license-photography/*; and (x)  *https://www.entrepreneur.com/article/302607.*

Additionally, on October 9, 2020 Dr. Einhorn provided a supplemental report, identifying "a more detailed accuracy of the documents that [he] reviewed leading up to the preparation of the [March 20, 2020] report."  The list of documents reviewed includes all documents referenced in the above report as well as the "Expert Report of Weston Anson, including  exhibits or appendixes and Excerpts of Plaintiff's deposition transcript."

Plaintiff's counsel, "[Einhorn] is not a liability expert testifying to facts.  He is a damages expert testifying to damages."  (D.E. #134-5, Einhorn Tr., 86:17-20).

## V.      THERE IS NO BASIS TO EXCLUDE EINHORN'S SUPPLEMENTAL REPORT

Plaintiff contends that the supplemental report must be precluded for two reasons.  First, Plaintiff argues that Defendant did not timely exchange the supplemental report.  Second, Plaintiff argues that the Supplemental Report is improper under Federal Rule of Civil Produce Rule 26(2)(D)(ii) and (iii).

### a.  Plaintiff Waived Any Objection to Alleged Late Disclosure of Supplanting Report & Plaintiff Cannot Establish Any Prejudice from the contents of the Supplemental Report

In an attempt to sidestep the glaring flaws in the Anson Report, Plaintiff seeks to preclude Defendants' Supplemental Report on the grounds that it was untimely.  This argument is wholly without merit as Plaintiff waived any objection under Rule 37 by not raising it until seven months after disclosure of the subject supplemental report and after deposing Mr. Einhorn on the contents of that report.  A Rule 37 motion must be promptly made.  *See Mercy v. County of Suffolk*, 748 F.2d 52, 55 (2d Cir. 1984); *In re Terrorist Attacks on September 11, 2001,* 03-MD-1570, 2018 U.S. Dist. LEXIS 145552, at *259 (denying Rule 37 application for failure to produce responsive documents were application not promptly brought).  Here, Plaintiff did not raise this issue with the Court after service of the Einhorn Supplemental Report.  In an attempt to rectify this failure, Plaintiff's counsel relies on edits to a joint letter in which he did not agree to sur-reply reports.  The Einhorn Supplemental Report was not a sur-reply as it did not address the substance of any rebuttal report of Plaintiff's experts.

Further, Plaintiff cannot credibly argue that any prejudice was suffered because the Supplemental Einhorn Report was served almost seven months prior to Mr. Einhorn's deposition, and Plaintiff's counsel questioned Mr. Einhorn on its contents.  Plaintiff's counsel falsely claims

that his experts were unable to rebut the contents of the Supplemental Einhorn Report because the deadline had passed.  However, Plaintiff's was well within his rights to submit a rebuttal report at any time, but chose not to. This Court has repeatedly advised the parties that they are free to adjust certain discovery deadlines upon agreement. *See* Order, dated July 26, 2019, D.E. 64; Order, dated September 4, 2020, D.E. 113.  Had Plaintiff requested Defendants' consent to file an amended expert report, which he did not, there would have been no objection.  Plaintiff chose to take no action following receipt of the Einhorn Supplemental Report and cannot now claim prejudice especially where he was able to depose Mr. Einhorn on the contents of the report. Tellingly, plaintiff makes this application despite proffering the Supplemental Anson Report <u>after</u> Mr. Anson was deposed in which Mr. Anson attempts to change the very fundamental nature of his opinion on damages. *See* Defendants' Omnibus Motion, page 5.

Plaintiff argues that the Supplemental Report was improper under FRCP Rule 26(2)(D)(ii) and (iii) because "it was a new report which changed its findings."  (Pl.'s Br. at pp. 19-20).  Plaintiff claims "[t]he duty to supplement does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' original report. (citation omitted)."  (Pl. Br., 20).  Plaintiff cannot plausibly argue that he was prejudiced or "sandbagged" by the Supplemental Report.

Once again, Plaintiff's position is undermined by a case that Plaintiff cites to.  In *Fahmy*, the plaintiff sought to exclude certain testimony of defendants' expert witness on the grounds that it was not timely disclosed.  *Fahmy*, U.S. Dist. LEXIS 129446, at 15.  At the expert's deposition in *Fahmy*, the expert identified "three new pieces of prior art [] that he had not previously disclosed to plaintiff."  *Id.* at 17.  The plaintiff argued that the "new disclosure" should be excluded "because plaintiff did not have an adequate opportunity to depose [the

expert] and neither plaintiff's counsel nor plaintiff's experts have had an adequate opportunity to review and rebut [the expert's] use of this evidence." *Id.* In denying the plaintiff's motion, the court held, "[the expert's] reliance on the new art was disclosed to plaintiff and that plaintiff has failed to sufficiently establish he has been prejudiced by any alleged delay in disclosing this evidence." *Id.* at 18.

The facts in this case are even stronger in support of admitting Dr. Einhorn's Supplemental Report. First, Plaintiff was more than "generally aware" that Dr. Einhorn intended to testify about the alleged damages in this case based on Defendants' Expert Disclosure and the Initial Report. *Fahmy,* U.S. Dist. LEXIS 129446, at 17 (citing *Antonick v. Elec. Arts Inc.* 2014 U.S. Dist. LEXIS 7924, at *8 (n.3) (N.D. Cal. Jan. 22, 2014) (refusing to strike portions of trial testimony in which expert "opined about maters outside of his initial report and rebuttal report [because the expert's statements] were sufficiently disclosed in his report or his *deposition*") (emphasis added).

Second, the Supplemental Report was exchanged less than six weeks after the Initial Report; the Initial Report was served on February 14, 2020 and the Supplemental Report was served on March 23, 2020. Third, expert depositions did not take place until more than six months after Defendants exchanged the Supplemental Report. Plaintiff's experts Mr. Wallace and Mr. Anson were deposed on October 7, 2020 and October 13, 2020, respectively. Dr. Einhorn's deposition was conducted on October 8, 2020. Plaintiff and Plaintiff's experts had ample time to review the Supplemental Report prior the Dr. Einhorn deposition; Plaintiff does not dispute that he was able to, and in fact did, question Dr. Einhorn extensively about his Supplemental Report during the October 8, 2020 deposition. Like *Fahmy,* Plaintiff is unable "to

sufficiently establish that he has been prejudiced by any alleged delay in disclosing this evidence." *Id*. at 18.

## VI.   AFROPUNK'S CHIEF OPERATION OFFICER, ALLEN LAMB, IS QUALIFIED TO TESTIFY AS TO DEFENDANTS' FINANCIAL INFORMATION

Plaintiff contends that because Dr. Einhorn did not provide a "financial analysis as to what the Defendants costs were and what its proper deductible allowances are from gross profit or operating the festival…Defendants should be precluded from offering any testimony on the subject of Afropunk's costs and expenses properly deductible." (Pl. Br. 22). Plaintiff's argument fails for two main reasons.

First, Dr. Einhorn did not conduct such an analysis because he was not was not required to do so – and again, could not do so as Plaintiff's causality burden was not met.  As stated *supra* in Section IV*,* because Plaintiff failed to establish a causal connection between the infringed activity and the infringer's gross revenue, the burden never shifted to Defendants to provide an analysis on offsetting costs and profits. Plaintiff's failure to establish causation obviated Defendants' need to perform such an analysis. *On Davis*, 246 F.3d at 160.

Notwithstanding the foregoing, in Defendants' Proposed Pretrial Order, Defendants disclosed Mr. Alan Lamb, the Chief Operating Office of Afropunk, to testify as to (i) Afropunk's corporate and financial structure; (ii) the hiring of photographs; and (iii) agreements pertinent to this case. (D.E. 129).   By no means is Mr. Lamb being offered as a "surprise" witness. Plaintiff's counsel, Mr. Greener, personally conducted the deposition of Mr. Lamb on August 27, 2019.  If necessary, Mr. Lamb is qualified to testify as to Afropunk's financial information, including "costs and expenses properly dedicible under the Copyright Act § 504(b) or other sources of revenue from non-infringing activity."

## CONCLUSION

In closing, numerous Second Circuit cases and others across the nation fully support the requirement of Plaintiff to first prove causality in copyright damages, whether Plaintiff seeks actual damages or disgorgement of Defendants' profits.  Plaintiff admits he has this burden. Plaintiff also admits that his support for proving actual damages is based solely on two trademark experts.  Upon excluding his trademark experts, and leaving no additional credible, non-speculative evidence left to present to a jury – this Court must dismiss this case.  *See, e.g., Apollo Theater Found. Inc. v. W. Int'l Syndication*, 02 Civ. 10037, 2005 U.S. LEXIS 7955 (S.D.N.Y. May 6, 2005) (granting summary judgment dismissal of plaintiff's actual damages claim in copyright infringement action, holding that "[e]ven under the most favorable hypothetical in [plaintiff's] expert reports…there is no evidence to support the conclusion that [plaintiff] would have earned a net profit"); *Childress v. Taylor*, 798 F. Supp. 981, 991-92 (S.D.N.Y. 1992) (claim for actual damages too speculative to support any award of actual damages).  Similarly, seeking a defendant's profits based upon hypothetical speculation and conjecture has resulted in dismissal.  *See, e.g., BGC Partners Inc.,* 2013 U.S. Dist. LEXIS 59779 at *9; *On Davis*, 246 F.3d at 160 ("the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues"); *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983) ("If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.").

**WHEREFORE**, Defendants respectfully request that this Honorable Court deny Plaintiff's Daubert Motion that seeks to exclude the expert testimony of Dr. Michael Einhorn.

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**

   _/s/Jonathan D. Goins_
Jonathan D. Goins, Esq. (*Admitted Pro Hac Vice*)
Brian Pete, Esq.
Devin S. Cohen, Esq.
77 Water Street, Suite 2100
New York, New York 10005
Tel: (212) 232-1300
Fax: (212) 232-1399
Jonathan.Goins@lewisbrisbois.com
Brian.Pete@lewisbrisbois.com
Devin.Cohen@lewisbrisbois.com