Robert L. Greener, Esq.
LAW OFFICE OF ROBERT L. GREENER P.C.
112 Madison Avenue, 6th Floor,
New York, NY 10118
(646)415-8920 Phone
(212) 689-9680
rlg@greenerlegal.com
Attorney for Plaintiff MAMBU BAYOH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

MAMBU BAYOH.

                              Plaintiff,

          v.

AFROPUNK FEST 2015 LLC, AFROPUNK LLC,
AFROPUNK GLOBAL INITIATIVE LLC., and
MATTHEW MORGAN, and JOCELYN COOPER
individually.

                              Defendants.

_____

### PLAINTIFF'S MEMORANDUM OF OPPOSITION TO DEFENDANTS MOTION IN LIMINE AND OMNIBUS MOTION

Respectfully submitted,

LAW OFFICE OF ROBERT L. GREENER
*Attorney for Plaintiff*
112 Madison Avenue, 6th Floor
New York, NY 10118
(646) 415-8920
(212)689-9680

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . .…………….... 1

II.   ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. …......,,,,,,,,,,,,,,1

A.   **ROBERT WALLACE WAS WELL QUALIFIED TO RENDER AN OPINION
     AND REPORT IN THIS CASE** ………………………………………………......…...1

    1. Plaintiff's Expert Robert Wallace Possesses The Necessary Background
       And Experience To Support His Report, And Survey Under F.R.E. 702……….……….3

    2. The Wallace Reports, And Mr. Wallace's Testimony Is Sufficiently Reliable
       To Be Admitted In This Matter…………………………………………….……….7

    3. The Wallace Survey Used Court Accepted Methodology For Consumer Surveys……9

        a.   The Court found the Bayoh Copyright Registrations to be valid in the
            January 15, 2020 Order of the Court…………………………………………12

        b.   There is no finding of an implied license in this case, and so Plaintiff's
            experts did not have to assume the existence of one when rendering
            their opinions………………………………………………………………13

        c.   Defendants in this case have admitted to using the copyrighted
            photographs at issue, and therefore there is no genuine question of fact
            as to use of the photographic works by Defendants at their festivals………..13

    4. Wallace's Survey Questions Administered In the Survey Were Compliant
       With Applicable Standards Of Consumer Sentiment Or Opinion Survey…………….14

B.   **THE CONSOR REPORT COMPLIES WITH THE STATUTORY
     REQUIREMENT UNDER THE COPYRIGHT ACT SECTION 504(B)
     REGARDING REPORTING OF GROSS REVENUE; AND FURTHER IS
     RELIABLE AND FITS THE PURPOSE OF THE
     CASE**……………………………………………………………………….……17

1.   **PLAINTIFF MET ITS BURDEN UNDER 17 U.S.C. 504(B), IN SUPPLYING TO
     THE COURT THE GROSS PROFITS EARNED BY DEFENDANTS…………………18**

2.   **PLAINTIFF HAS SUPPLIED THE NECESSARY CAUSAL NEXUS**

BETWEEN INFRINGEMENT AND GROSS PROFITS ……………………..…………22

3.  DEFENDANTS FAILED TO MEET THEIR BURDEN UNDER 17 U.S.C.
    504(B), IN IDENTIFYING THEIR COSTS AND EXPENSES OR "ELEMENTS
    OF PROFIT ATTRIBUTABLE TO FACTORS OTHER THAN THE
    COPYRIGHTED WORK."……………………………………………………………..25

    a)  Defendants failed to establish other factors than use of the infringing photos
    were behind the increase in sales for the Afropunk festival…………………..……...25

    b)  The Consor Report could properly considered indirect revenue in its analysis…..….26

    c)  Defendants failed to provide adequate evidence concerning profits and
    expenses, and therefore such an analysis was not necessary to the
    Consor Report…………………………………………………………..………28


D. MR ANSON PRESENTED PROPER ACTUAL DAMAGE AND
    DISGORGEMENT OF PROFIT ANALYSIS IN HIS REPORT………………………29

E. THE ANSON REPORT HAS PRESENTED A PROPER VALAUATION OF
    ACTUAL DAMAGES IN THIS MATTER………………………………………………30


C.  VICARIOUS LIABILITY……...…………………………………………..………..34


IV.  CONCLUSION . . . . . . . .. . . . . . . . . … . . . . .. . . . . . . . . …...............  . . . ...35

## TABLE OF AUTHORITIES

| Statutes | Pages |
|---|---|
| F.R.E 803……………………...……………………………………………………...…………10,11 | |
| 17 U.S.C. § 504(B)………………….……………………………………..…………17,18,22,24,26 | |
| F.R.E 705………………………………………………………………………………...…22 | |

Fed. R. Civ. P. 26(2)(d)……………………………………………………………………….30

Fed. R. Civ. P. 26(e)………………………………………………………………………...30

17 U.S.C §501(a)………………………………………………………………………....…30

**Cases**

Kumho Tire Co. v. Carmichael,

526 U.S. 137, 150, 119 S. Ct. 1167, 1175, U.S. LEXIS 2189, *22, (US 1999) ………………….2

United States v. Brown,

776 F.2d 397, 400 (2d Cir. 1985)………………………………………………...…..……………3

Davis   v. The Gap Inc.,

246 F.3d 152, 160 (2d Cir. 2001)……………………………………………………….4,18,22,26,30

Graham v. Prince,

265 F. Supp. 3d 366, 2017 U.S. Dist. LEXIS 111521, at *43 (N.Y.S.D., 2017)…………..…4,26

re LIBOR-Based Fin. Instruments Antitrust Litig.,

299 F. Supp. 3d 430,466, 2018 U.S. Dist. LEXIS 33640, at *95 ………………………………...6

Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,

691 F. Supp. 2d 448, 457 (S.D.N.Y. 2010) ……………………………………….……...6

Valentin v. New York City,

1997 U.S. Dist. LEXIS 24059, 1997 WL 33323099, at *15 (E.D.N.Y., 1997). ……………....7

United States v. Pryor,

474 F. App'x 831, 834 (2d Cir. 2012…………………………………………...………..…...7


Solid Oak Sketches, LLC v. 2K Games, Inc.,

2020 U.S. Dist. LEXIS 53287, (S.D.N.Y., 2020)…………………...………………….…….7


Tiffany (NJ) Inc. v. eBay, Inc.,

576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007)………………………………………………….8


Fahmy v. Jay Z,

2015 U.S. Dist. LEXIS 129446 (C.D. Cal. 2015)……………...…………………….…..8


Reinsdorf v. Skechers U.S.A.,

922 F. Supp. 2d 866, 2013 U.S. Dist. LEXIS 16223, 2013 WL 454828 (C.D. Cal. 2013)…...….8


Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.,

82 F.3d 1533, 1996 U.S. App. LEXIS 10223, (10th Cir., 1999)……………….………….………8


Ashley Furniture Indus. v. Am. Signature, Inc.,

2014 U.S. Dist. LEXIS 197503, (S.D Ohio, Easter Division, 2014)…………….…………..8


Sterling Drug, Inc. v. Bayer AG,

14 F.3d 733, 741 (2d Cir. 1994)………………………….………………….…….9


Doctor's Assocs. v. QIP Holder LLC,

2010 U.S. Dist. LEXIS 14687, (D. Conn, 2010)……………………………………..…….10

Schering Corp. v. Pfizer Inc.,

189 F.3d 218, 1999 U.S. App. LEXIS 19265, ("2d. Cir, 1999)……………………………...11,14


Velez v. Sony Discos,

2007 U.S. Dist. LEXIS 5495, 2007 WL 120686 *6 (SDNY, 2007)………………………..…...11


Laureyssens v. Idea Group, Inc.,

964 F.2d 131, 139, 1992 U.S. App. LEXIS 10643, (2d. Cir. 1992) ………..…………………...12


Semerdjian v. Littell,

641 F. Supp. 2d 233, 2009 U.S. Dist. LEXIS 53273 (S.D.N.Y. 2009)………………………….17

Burns v. Imagine Films Entm't, Inc.,

2001 U.S. Dist. LEXIS 24653, (S.D.N.Y, 2001)………………………………………………...17


Mannion v. Coors Brewing Co.,

530 F. Supp. 2d 543, 2008 U.S. Dist. LEXIS 544, (S.D.N.Y., 2008)…………………………...18


Fournier v. McCann Erickson,

242 F. Supp. 2d 318, 328, 2003 U.S. Dist. LEXIS 703(N.Y.S.D, 2003)………………………..21


Hopkins v. AMTRAK,

2015 U.S. Dist. LEXIS 196952, 2015 WL 13741721*19. (E.D.N.Y., 2015)…………………...23


Fournier v. Erickson,

242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003)……………………………………………………...27

Broadspring, Inc. v. Congoo,

2014 U.S. Dist. LEXIS 177838, 2014 WL 7392905, at *9 (S.D.N.Y. Dec. 29, 2014)………….27


Complex Sys., Inc. v. ABN Ambro Bank N.V.,

2013 U.S. Dist. LEXIS 160291, 2013 WL 5970065, *2 (S.D.N.Y. Nov. 8, 2013)……………..27


Caffey v. Cook,

409 F. Supp. 2d 484, 504, 2006 U.S. Dist. LEXIS 2090 (N.Y.S.D., 2006)…………………….28


Yurman Design v. Chaindom Enterprises, Inc.,

2003 U.S. Dist. LEXIS 15064, (S.D.N.Y. 2003)…………………………………………….29


re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,

643 F. Supp. 2d 471,481, 2009 U.S. Dist. LEXIS 62649…………………………………30


Sony Corp. of America v. Universal City Studios, Inc.,

464 U.S. 417, 434–35, 104 S.Ct. 774, 784–85, 78 L.Ed.2d 574……………………………..31


Gershwin Pub. Corp. v. Columbia Artists Management, Inc.,

443 F.2d 1159,1161………………………………………………………………….…..31,33


EMI Entertainment World, Inc. v. Karen Records, Inc.,

806 F.Supp.2d 69 (S.D.N.Y. 2011)……………………………………………………31,33


Ms. Cooper. Peer Intern. Corp. v. Luna Records, Inc.,

887 F.Supp. 560 (S.D.N.Y. 1995)……………………………………………………………31


Laspata DeCaro Studio Corp. v. Rimowa GmbH,

vii

2018 U.S. Dist. LEXIS 103347, *17, 2018 WL 3059650…………………………...……….32


Getaped.com, Inc. v. Cangemi,

2001 U.S. Dist. LEXIS 22591, 2001 WL 1606732………………………………………….32


Pasatieri v. Starline Prods.,

2020 U.S. Dist. LEXIS 6251, 2020 WL 207352………………………………………….32

## I. PRELIMINARY STATEMENT.

On October 16, 2020, Defendants filed two motions in limine basically seeking to preclude the Plaintiff's two experts in accordance with FRE 702. The following memorandum is in opposition to Defendants' Motion In Limine, and the Omnibus Motion.

## II. ARGUMENT.

### A.    ROBERT WALLACE WAS WELL QUALIFIED TO RENDER AN OPINION AND REPORT IN THIS CASE.

Defendants seek to preclude Plaintiff's expert Robert Wallace on the grounds that he is an expert in trademark surveys and not copyright. However, consumer sentiment surveys are not grouped or specialized into trademark or non-trademark surveys. Defendants argue Mr. Wallace "has no discernable training and experience with survey design and interpretation in copyright infringement cases, and he demonstrated his lack of knowledge of industry standards and applied only subjective standards in his report.",[1] . This rings hollow as there is no specific category for Copyright infringement surveys to which an expert might have experience.

No standards or criteria issued by the Courts exist nor is there other authority specifically for a copyright infringement survey. As trademark and copyright law are very similar, often courts apply similar analysis regarding evidence, experts, and damages. A copyright survey would be subject to the same rules regarding reliability and methodology as would any other survey offered to the Court. As will be shown, while not often presented, copyright surveys have not rejected per se by the Court in cases where they have been used.

---

[1] Defendants Memorandum of Law in support, page 5.

1

Defendants Point B. 1. at page 5, argues Wallace does not possess the required experience necessary to prepare and submit the report at issue. As will be shown, Mr. Wallace has the requisite knowledge, background, and experience to create and offer a survey of the type at issue in this case. Further, his survey was not only relevant, but established a core concept needed by the trier of fact; to wit: how to measure consumer sentiment and affinity for the infringed Bayoh photographs as relates to ticket purchases to Afropunk festival's.  Thus, it connected use of the photographs to increased revenue for Defendant Afropunk to establish what the damages are in this case.

As the Supreme Court rightly noted in *Khumo Tire*, "In other cases, the relevant reliability concerns may focus upon personal knowledge or experience. As the Solicitor General points out, there are many different kinds of experts, and many different kinds of expertise. See Brief for United States as Amicus Curiae 18-19, and n. 5 (citing cases involving experts in drug terms, handwriting analysis, criminal modus operandi, land valuation, agricultural practices, railroad procedures, attorney's fee valuation, and others)." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S. Ct. 1167, 1175, U.S. LEXIS 2189, *22, (US 1999)

Under *Kumho Tire*, a trial judge has "considerable leeway in determining whether particular expert testimony is reliable." *Kumho Tire Co*., 526 U.S. at 152. In evaluating a proffered expert's qualifications, "[t]he trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." Kumho Tire Co., 526 U.S. at 156. Daubert requires that the expert possess expertise assessed in the context of the "nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony." Id. at 150. Defendants do not argue or present evidence that Mr. Wallace does not

2

have the knowledge, experience, or technical expertise to create a consumer sentiment survey[2], or

that such experience is limited to Trademarks only.

**1.   Plaintiff's Expert Robert Wallace Possesses The Necessary Background And Experience Necessary To Support His Report, And Survey Under F.R.E. 702.**

Courts in this Circuit give a liberal assessment when reviewing a witness's qualification to

testify as an expert in a case. See, United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985).  When

deciding to allow an expert's testimony, Courts look to the expert's knowledge on a subject and

whether it will assist the trier of fact in making decisions regarding ultimate issues in the case. Id.

An examination of Mr. Wallace's qualifications starts with his Curriculum Vitae (CV) and work

history. Mr. Wallace's CV is attached to his report (Defendants' Exhibit "A" DCKT # 134-1, p's

28-30 and Plaintiff's Exhibit "G").

Wallace claims he appeared in over sixty cases as an expert. Reviewing Mr. Wallace CV,

he lists his work as a Copyright damage expert. Further, as a professional marketing and branding

executive he states he has substantial involvement in copyright related work outside of his capacity

as an expert, involving industries such as the entertainment and event marketing. Mr. Wallace sets

out his relevant industry experience relating to his analysis of the use of photograph in marketing

and branding on page 3 Section II, Summary of Qualifications.  Mr. Goines never inquired as to

---

[2] Defendants cite to M2 Software, Inc., v. Madacy Entertainment, 421 F.3d 1073, 1087 (9th Cir. 2005), and Valador, Inc. v. HTC Corp., 242 F. Supp. 3d 448, 458 (E.D. Va. 2017), aff'd, 707 Fed. Appx. 138 (4th Cir. 2017) in support of this Point. However, the cites are misplaced. *M2 Software*, is not a copyright case and the Court did not reject the survey because it was improper to show consumer sentiment in a copyright context. Rather, it was rejected because the expert was not qualified to create the survey and his methodology was improper.  The Circuit Court did not discuss in the opinion why the expert was not qualified to offer the survey or what was improper about the survey's method except to note that the expert "did not qualify as an expert on designing or analyzing consumer surveys." Id. at 1087.  In *Valadoe*, the 4th Circuit did conduct an analysis on the expert qualifications of the witness.  However, the expert in question was hired to conduct a consumer survey case measuring consumer confusion in a trademark case having never created a survey prior to that one in a trademark case.  As discussed herein, this analysis does not apply to Mr. Wallace background or experience. Thus, *Valadore* would not apply here either.

3

what this experience entailed. In fact, no testimony was elicited which contradicted Mr. Wallace's claim to be an expert in Copyright related matters.

However, an analysis of Mr. Wallace's qualifications to provide expert testimony cannot be held, without a "rigorous analysis"[3] of the facts surrounding the claimed infringement herein. Assuming that the Court is familiar with the case history, the key points relevant to this motion are that the claimed infringement involves admitted actual copying of Bayoh Copyrighted photographs. The unlawful uses of his work were not to sell products, or books or songs, but to market, advertise and promote an African-American cultural and music festivals. Defendants themselves do not deny Plaintiff owned the photos in question or that they had access to them. Nor, do they deny that the photos were used for marketing, promotion, advertising, of Afropunk's festival or on Afropunk's website and social media accounts. Plaintiff argues that his works were so unique and compelling that Defendants basically used the photographs as the branding for their festivals from 2015 to 2018 resulting in increased attendance and ticket sales for Afropunk's festival.

In the Second Circuit, it is Plaintiff's burden to show how the infringing use of his photographs by Defendants led to increased ticket and merchandise sales for the Afropunk festivals. Davis v. The Gap Inc., 246 F.3d 152, 160 (2d Cir. 2001). A plaintiff in a copyright case can seek direct and indirect profits from the infringer. Id. See also, Graham v. Prince, 265 F. Supp. 3d 366, 2017 U.S. Dist. LEXIS 111521, at *43 (N.Y.S.D., 2017). For this Plaintiff would have to show how the use of his photographs in marketing the festival lead to dramatically increased

---

[3] "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand". Amorgianos v. Amtrak, 303 F.3d 256,267, 2002 U.S. App. LEXIS 17792 (2d Cir., 2002)

revenue. Mr. Wallace's survey connected the relationship between how a typical consumer of an Afropunk like festival would view marketing and promotion using the works in question; and, if that view would more likely than not to lead to increased revenue for Afropunk's festivals. Germain to the issues is an expert who understood the nature and use of photography in selling and merchandising goods, services, and products, coupled with one who had experience in measuring consumer sentiment and resulting actions. Mr. Wallace's background has both.

Mr. Wallace himself crystallized the contextual argument quite nicely at his deposition. In the following exchange, Mr. Goins, Counsel for the Defendants, asked Mr. Wallace what was the purpose for which he was retained as an expert in the case.[4]  He responded as follows:

> "A. Yes. Based on my expertise as a brand identity strategist and the owner of a branding identity design firm, I was asked to analyze the photography used to promote the AfroPunk Festival the defendants -- the -- Mr. Bayoh's -- excuse me -- not the defendants, but Mr. Bayoh's photography used to promote the AfroPunk festival.I was also asked to view photographs used prior to Mr. Bayoh's work in promoting the AfroPunk festival to determine if Mr. Bayoh's work was consistent with the message of the AfroPunk brand and then to conduct a court compliance survey to determine if potential AfroPunk consumers or attendees would be influenced by Mr. Bayoh's photography in the context of AfroPunk to learn more about the festival to potentially purchase tickets and to buy merchandise from AfroPunk. So quick summation is to determine if Mr. Bayoh's work met AfroPunk's objectives and if Mr. Bayoh's work enhanced AfroPunk's revenues in driving attendee interest and willingness to purchase tickets and merchandise"[5]

Further on, Mr. Goins again asked Mr. Wallace about his expertise to give opinion on those issues of copyright related damages as opposed to trademark, as describe in his prior answer above; Mr. Wallace's answered as follows:

> "A. I'm not an attorney; so I'm not familiar with those terms from a legal standpoint. I'm also not an economist. So I don't believe my intent was to determine damages or the results. My intent was to determine if the impact of -- if Mr. Bayoh's

---

[4] Wallace Deposition p.15, L.13- p.17, L.2. (Defendants' Exhibit "B", DCKT #134-2.)
[5] Wallace Deposition, p.16, L. 6 to p.17, L.2.

work was used without his authorization, if his trademark -- excuse me – his copyright on that work was infringed upon and if the infringing use of his work generated value to the AfroPunk brand. Those are the elements I feel exceptionally comfortable on opining on." [6]

Defendants never probed Mr. Wallace's ability to opine on the issues or elicit any testimony which backs their assertion that Wallace is not qualified to give testimony as a damage expert or create a consumer opinion survey in copyright infringement case.  Mr. Goians failed to show that Wallace had no referential experience in testing consumer sentiment. Instead, the examination focused on establishing Mr. Wallace as a trademark survey expert.

Wallace's background established that he has survey experience from other cases he appeared in and possesses sufficient requisite knowledge of copyright issues generally and infringement matters specifically to render his opinion. Thus, he is qualified to speak on these issues.   See In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430,466, 2018 U.S. Dist. LEXIS 33640, at *95 ("Indeed, "[c]ourts in this circuit have noted that an expert should not be required to satisfy an overly narrow test of his own qualifications." [citations omitted]. "[T]he Second Circuit [has] allowed an expert to testify as to matters within his general expertise even though he lacked qualifications as to certain technical matters within that field." Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 691 F. Supp. 2d 448, 457 (S.D.N.Y. 2010) (citing McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042-43 (2d Cir. 1995))").

If anything, the testimony given by Mr. Wallace reaffirmed his background to offer his opinion in the case. In the end, qualifications of an expert go to weight of the testimony

---

[6] Wallace Deposition, p. 17, L.'s 3 to 17.

6

not admissibility. <u>Valentin v. New York City</u>, 1997 U.S. Dist. LEXIS 24059, 1997 WL

33323099, at *15 (E.D.N.Y., 1997). On this basis Mr. Wallace is well qualified to offer his

opinion in this matter.

**2. The Wallace Reports, And Mr. Wallace's Testimony Is Sufficiently Reliable To Be Admitted In This Matter.**

Defendants have conceded that Mr. Wallace is qualified to create and testify to

consumer surveys. What they really argue is that the Wallace survey is not sufficiently

reliable to use in a Copyright infringement matter.  A witness is 'qualified as an expert'  if

"(1) 'the testimony is based on sufficient facts or data,' (2) 'the testimony is the product of

reliable principles and methods,' and (3) 'the expert has reliably applied the principles and

methods to the facts of the case.'" <u>United States v. Pryor</u>, 474 F. App'x 831, 834 (2d Cir.

2012) (summary order) (quoting Fed. R. Evid. 702).

Defendants argue that there is no authority for use of a survey in a copyright infringement

case[7], but this is not true. While surveys are most often used in trademark and trade dress cases,

they are not foreign to Copyright matters. A recent Southern District Court case is right on point

here. The Court in, <u>Solid Oak Sketches, LLC v. 2K Games, Inc.</u>, 2020 U.S. Dist. LEXIS 53287,

(S.D.N.Y., 2020), allowed a consumer opinion survey into evidence to determine whether, and to

what extent, a basketball player's copyrighted Tattoos drove consumer demand for a basketball

video game.  What is interesting and quite informative to this case is that Judge Swain allowed

four different experts to opine on whether defendant 2K Games infringed on plaintiff's Tattoo

---

[7] Defendants Memorandum in support at Page 10.

7

copyrights. The first was a consumer survey expert, the second an expert on skin and Tattoos, the third an expert on interactive gaming, and the fourth a financial expert.

*Solid Oak*, establishes that different types of experts can be used to render an opinion in copyright matters depending on the nature and extent of the claimed infringement.  What is important is whether the survey will be helpful to the factfinder and has used sound methodology in arriving at its conclusions. In Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007), the District Court stated that, "In assessing the relevance of proffered expert testimony, the Court looks to whether the testimony has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. at 459. Despite what Defendants argue there is no bright line rule prohibiting consumer survey evidence in Copyright infringement matters.

Cases in the Ninth Circuit have also allowed consumer surveys in copyright cases. See, Fahmy v. Jay Z, 2015 U.S. Dist. LEXIS 129446 (C.D. Cal. 2015)(Consumer survey used in Musical Copyright infringement matter); and Reinsdorf v. Skechers U.S.A., 922 F. Supp. 2d 866, 2013 U.S. Dist. LEXIS 16223, 2013 WL 454828 (C.D. Cal. 2013)(Survey evidence allowed in in infringement action of copyrighted photograph used in marketing by shoe company).

A Tenth Circuit case also allowed use of survey evidence in a copyright infringement matter, in Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1996 U.S. App. LEXIS 10223, (10th Cir., 1999). In Ashley Furniture Indus. v. Am. Signature, Inc., 2014 U.S. Dist. LEXIS 197503, (S.D Ohio, Easter Division, 2014) a consumer survey evidence was submitted in support of Plaintiff Ashley Furniture' copyright infringement claim for use of photos of its furniture in the defendant's advertising.  The Ohio District Court ultimately dismissed the claim on fair use grounds, not because it precluded the survey evidence. Generally, if a survey is probative it may

8

be admitted into evidence if it is "fairly prepared and its results directed to relevant issues." Sterling

Drug, Inc. v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994). Wallace's survey is probative of the

issues in this case and relevant to the damages suffered by Plaintiff due to the infringement.

### 3. The Wallace Survey Used Court Accepted Methodology For Consumer Surveys.

Mr. Wallace states in his initial report dated August 28, 2019, that he used the Manual for

Complex Litigation, Fourth Edition, 2004, and the Reference Manual on Scientific Evidence,

Third Edition both prepared for the Federal Judicial Center, as a guide in preparing the survey. As

already established above, there is no specific 'copyright infringement' survey methodology, so it

would be appropriate to use structural elements from trademark infringement, false advertising

cases, and trade dress infringement[8] as the nearest kin. In this case Mr. Wallace conducted a

Monadic study, which are preferred tests of consumer survey sentiment, like this one as it reduces

bias in the survey.[9]  Defendants have not challenged this method.

In his report, Mr. Wallace identifies seven criteria found in the Manual for Complex cases

required for a survey to be admissible:[10]

"a. The proper universe(s) should be properly chosen and defined;
b. The sample of respondents chosen from the proper universe should be representative
of that population;
c. The questions asked should be clear and not leading;
d. The data gathered should be accurately reported;
e. The data should be analyzed in accordance with accepted statistical principles;
f. The surveys should be conducted by qualified persons following proper interview
procedures;
g. The surveys should be conducted in anticipation of litigation and by persons not
connected with the parties or counsel or by persons not aware of its purpose in the
litigation."

---

[8] "Many of the case-management considerations in a copyright case also apply to trademark cases. Similar issues arise relating to arbitrability, remedies sought, and the scope and issuance of protective orders." Manual for Complex Litigation, 4th Edition, page 641.
[9] See, generally https://conjointly.com/blog/what-is-monadic-testing/ and
https://www.surveymonkey.com/mp/monadic-versus-sequential-monadic-survey-design/
[10] Wallace Report page 13 (DCKT #134-1)

9

Defendants do no allege that use of the Manual for Complex Litigation or Reference Manual on Scientific Evidence are improper sources; nor, why the seven criteria used were inappropriate. Defendants refer to the "Diamond Scientific Reference Manual"[11] but, do not cite to it to explain how the text supports their argument on use of the above seven factors or a Monadic survey.

Defendants themselves do not present any expert testimony supporting their argument that the design of the survey is flawed. Mr. Einhorn does not address survey methodology in his report. His analysis fails to rebut the type of questions used, the demographic sample used, sample size of the survey, pictures used as stimuli, or conducting the survey on the internet.  Nor did he establish question bias in the report either. Defendants presented no additional authoritative reports or studies, other than cases citing generalized legal concepts, in attacking the criteria used to create the survey. Defendants arguments on this point are self-serving legal conclusions by Counsel with no attachment to any authoritative source.

The Wallace survey was created to test the mental impressions of the respondents concerning their thoughts and feelings about the pictures used in the control stimuli.[12]  Its purpose was to discern what the demographic group felt about the two sets of photos and what, if any, impact they would have on a decision to purchase a ticket to the Afropunk festival. Courts in this Circuit have accepted mental impression surveys and held that they are exceptions to the Hersey rules in the FRE 803. Doctor's Assocs. v. QIP Holder LLC, 2010 U.S. Dist. LEXIS 14687, (D. Conn, 2010)("Further, as discussed above in the Court's analysis of the admissibility of the Steckel Survey, surveys that "poll individuals about their presenting existing states of mind to establish facts about the group's mental impressions" are generally admissible as a hearsay exception under

---

[11] Defendant's memorandum of law in support, page 8.
[12] Wallace report page 13, section VIII Survey Design.

Fed. R. Evid. 803(3). Schering Corp., 189 F.3d at 227."). See also, <u>Schering Corp. v. Pfizer Inc.</u>, 189 F.3d 218, 1999 U.S. App. LEXIS 19265, ("2d. Cir, 1999). Since there is no specific copyright survey methodology, the closest analogy would be a survey in a false advertising case, as those cases "poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions." Id. at 227, which are routinely accepted by Courts in the District.

Mr. Wallace's survey is presented to establish the nexus between infringement and profits for damages, and not liability. As stated above, the Court needs to review the facts of the case to see if the expert's opinion 'fits'. This case does not involve substantial similarity between competing works, but rather actual identical copying. Defendants admit they had full access to the Copyrighted photos in Plaintiff's Dropbox and used them. They have never argued the infringed photos were not Plaintiff's photos; or, that Defendants never used them at their festivals. Thus, there is no need for a liability expert to opine as to whether the works were substantially similar, contained elements of the copyrighted photos, or somehow were transformative or derivative.

Direct copying is a question of fact that does not require an expert to opine on. <u>Velez v. Sony Discos</u>, 2007 U.S. Dist. LEXIS 5495, 2007 WL 120686 *6 (SDNY, 2007)("The first inquiry in the unauthorized copying analysis poses the purely factual question of whether the defendant 'actually copied' plaintiff's work, and can be proved by direct or indirect evidence."). Defendants argue that Wallace's survey is defective because it fails to establish liability concerning validity of the copyright registrations in this case. The survey was never created to test the validity of the Copyrights Registration as this had already been decided in the case (more on this point is addressed in the point below). Further, neither of Plaintiff's experts were retained to establish actual copying as Plaintiff can prove direct copying in this case without expert testimony. ("Copying may be established either by direct evidence of copying or by indirect evidence,

11

including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony.") Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139, 1992 U.S. App. LEXIS 10643, (2d. Cir. 1992).

Defendants admit they had access to the work in question. Defendants admit to having access to Plaintiff's Dropbox containing the Copyrighted photographs and admit they accessed it to remove those photos for their use at Afropunk festivals. [13] Thus, there are no questions of fact as to Defendants access to the works or their approbation requiring an expert to inform the jury about same.

Defendants also argue the survey fails to establish whether Afropunk's infringement went beyond the implied license; and failed to identify "specific acts of alleged infringement that resulted in revenue or profits by Afropunk".[14] Defendants forgoing arguments beg the question, and assume the truth of their conclusions. Again, these points have been resolved in this case.

a. The Court found the Bayoh Copyright Registrations to be valid in the January 15, 2020 Order of the Court.[15]

It is apparent throughout the motion papers that Defendants have not accepted the Court's decision on their summary judgement application. Many of their argument relitigate points already decided against them by the Court. One example concerns the validity of Plaintiff's Copyright registrations. Defendants posit that Wallace's survey needs to establish this fact. In section II of the January 15, 2020 Order, Judge Cote established the validity of the Plaintiff's registrations as law of the case. Since Defendants did not appeal this ruling, the Plaintiff's expert may rely on this

---

[13] See, Order of the Court dated January 15, 2020, page 16. Exhibit "1"hereto.
[14] Defendant's Memorandum of Law in support at page 9.
[15] DCKT #98.

fact when presenting their opinion. Thus, neither the Wallace nor the Anson report needs to establish this fact.

b. There is no finding of an implied license in this case, and so Plaintiff's experts did not have to assume the existence of one when rendering their opinions.

Time and time again in this case Defendants consistently assume that they have a valid license to use the infringing photographs. If this were the case, the Court would have granted them summary judgment. Their arguments continually spring forth from that poisoned wellspring. In its January 15, 2020 Order,[16] the Court addressed this argument. Judge Cote held that a genuine issue of facts exists regarding a license. Point IV. Of the January 15th decision makes clear Plaintiff had presented sufficient evidence to support his argument that no such implied license exists. Since Plaintiff has vehemently denied an implied in fact license exists, and the Court held it to be a question of fact, Plaintiff's experts can rely on this statement in their opinion.

c. Defendants in this case have admitted to using the copyrighted photographs at issue, and therefore there is no genuine question of fact as to use of the photographic works by Defendants at their festivals.

The last fallacious argument propounded by Defendants is that Plaintiff's expert failed to identify infringing uses of the Copyrighted works and resulting profit. This argument is a red herring as defendants have never denied they used Plaintiff's photographs in marketing, promotion, advertising, on the internet and social media as claimed by Plaintiff. Instead, Defendants have maintained that they had license to use them for those identified purposes. As stated above this case is one of direct copying of the photographs, all of which have been identified by both parties in pretrial discovery and motion practice. Both Wallace and Anson reviewed the

---

[16] "[A] genuine dispute concerning the scope of the license: Defendants say Bayoh gave them an unlimited license, while Bayoh says he licensed certain photographs to be used on Afropunk's 2015 festival website and Instagram page only. Given the conflicting evidence, the scope of the license cannot be resolved on summary judgment" January 15, 2020 Order at page 16.

13

Photos and the infringing use identified in original Complaint and Amended Complaint as part of their reports.[17]    Further, Defendant Morgan in his Deposition has admitted to using the Photographs at issue.[18]  As these issues are not in dispute these points are not germane to the expert reports.

**4**.    **Wallace's Survey Questions Administered In The Survey Were Compliant With Applicable Standards Of Consumer Sentiment or Opinion Surveys**.

Defendants attack the survey questions with a series of debatable and uncorroborated arguments. However, other than Counsel's subjective legal conclusions, no objective authority is used to substantiate the claims.   Generally, in assessing whether a survey is flawed, several factors are examined. "(1) whether a representative sample of a properly-defined universe was selected; (2) whether the questions were clear and precise or ambiguous and leading; (3) whether the data gathered was accurately reported and analyzed; and (4) whether the objectivity of the entire process was ensured". Schering Corp. v. Pfizer Inc., 189 F.3d 218, 225 (2d Cir. 1999).

Defendants fail to challenge Mr. Wallace use of the representative sample of a 'properly defined universe', so that is deemed waived. Defendants do not dispute the conclusions reached from the data, separate from their argument that the questions themselves are improper. Conclusions reached in the Wallace report are not being disputed and are waived. The gist of defendant arguments then goes to flaws in the survey questions and a failure to 'measure the relevant issues of this case' which is not a technical point but was dealt with in Point 3 above.[19]

---

[17] Wallace lists those documents he reviewed in Appendix 1 page 27, which included Afropunk's own disclosures.
[18] For the Court's convenience the transcript is attached as Exhibit "2" to the Greener Declaration. More particularly the Court is referred to pages 139, L. 3 to 177, 5. In these pages Mr. Morgan consistently admits that he knowingly, intentionally used the Plaintiff's photos as part of the Afropunk festival.  Further, in a telling exchange on page 254, Mr. Morgan admits that he did so because he believed had absolute rights to use all the Plaintiff's photos placed in the Dropbox in any manner he wanted.
[19] Defendants Memorandum of Law in support pages 9-12.

14

Defendants Memorandum of Law gives only two random questions as examples of alleged 'flawed' questions in the Report. Mr. Wallace sets out the scientific methodology used in crafting the questions in the survey in his report at page 16:

"In my expert opinion, all seven of the Standards delineated in the Manual for Complex Litigation, Fourth Edition, 20045 were followed in this survey. Furthermore, the following additional safeguards were observed:
a. Respondents were told to view the stimuli as if they were considering buying it; that is, it was presented in a purchasing context.
b. Respondents were told that it was permissible to have no opinion about a subject, and thus that they should not feel the need to guess at an answer.
c. Persons who had potentially atypical knowledge because of their occupation were excluded from the survey.
d. A control protocol was used to account for survey "noise."
e. Finally, the survey was "double blinded": neither the survey company nor the respondents knew the sponsor or the purpose of the study; thus, neither could influence the results, if even unwittingly."

Defendants have not presented authority which indicates that the method used to craft the questions are without merit, or that Wallace failed to follow them. All that the Court is presented with is an ipse dixit argument regarding bias and leading questions.

Defendants identify only two questions that are claimed to be biased or leading.  The first attack is on question 12a. of the report.[20] The claim here is that the event is not identified and thus confusing. However, this ignores the prior qualifying questions which are controls. Questions 5a, 4b and 5b, establish the control questions which concern attendance at African-American cultural or music festival so as to minimize confusion.  Actual results reported as part of the Wallace Report did not show any confusion as to the reference. See Final data appendix dated 8/27/2019 to the Wallace Report.

As the Report states, the identity of the sponsor is intentionally left out to avoid bias. Finally, the fact that the term "brand identity" was not defined, assumes the term to be so technical

---

[20] Defendants' Memorandum of Law in support at page 10.

that the average lay person could not understand its meaning, which is untrue. It is a common term and today's consumer is sophisticated enough to understand it. None the less Defendants have no support to show the term was confusing.

In any event, the second part of the question "Please rate on a scale of 1 to 5 how motivated you are to learn more and potentially attend this event based exclusively on this imagery, with 5 being "definitely attend" and 1 being "definitely not attend". A Don't know/Not sure response is acceptable" is not dependent on knowledge of what 'brand identity' meant, as it independently focused on the photographs presented and whether they would motivate the respondent to purchase a ticket to an event.  One could answer this question without understanding what brand identity meant.  Finally, without belaboring the point, the fourth photograph used as stimuli in the question is a photo of what appears to be a concert making it clear that in conjunction with the prior control questions, what type of event was being asked about in the question.  Thus, Defendant has failed to establish this question as flawed.

Defendants attack on question 14a. is a reach or as they say in popular parlance is a "nothing burger".  It's argued that the question is leading, thereby channeling the respondent into saying he or she would be motivated to attend the event.[21] However, this completely ignores the responses to the questions. A respondent properly had various choices for response ranging from having a large effect, to little or no effect on the respondent's decision to attend the event. A respondent also had a choice to say they were not sure, thereby providing the full range of no coercive responses with no bias to suggest which was the right answer.  Thus, again this was not a flaw in the survey.  For all the reasons above Defendants' motion to strike the Wallace report and expert testimony should be denied.

---

[21] Defendants' Memorandum of Law in support, page 11

16

**B.    THE CONSOR REPORT COMPLIES WITH THE STATUTORY REQUIREMENT UNDER THE COPYRIGHT ACT SECTION 504(B) REGARDING REPORTING OF GROSS REVENUE; AND FURTHER IS RELIABLE AND FITS THE PURPOSE OF THE CASE.**

Section 504(b) of the Copyright Act has a clear and concise statement regarding the burden each party bares to establish the gross and net profits of an infringer.  Under Section 504(b), it is Defendants' responsibility to show its costs and allowable deductions if the infringer seeks to have them excluded from consideration by the Court.  Additionally, the infringer, in this case Afropunk LLC, must establish what factors other than use of the infringing works were related to any profit claimed by a plaintiff, subject to actual damages or disgorgement.[22]

Point IV, of Defendants brief transposes these two burdens between the parties.  Once Plaintiff provides proof of gross profits, the burden switches to Defendants to establish allowable deductions for costs and for revenue not attributable to the infringement. Semerdjian v. Littell, 641 F. Supp. 2d 233, 2009 U.S. Dist. LEXIS 53273 (S.D.N.Y. 2009). Burns v. Imagine Films Entm't, Inc., 2001 U.S. Dist. LEXIS 24653, (S.D.N.Y, 2001).

Defendants incorrectly argue that Consor's report was fundamentally flawed as it failed to discount certain profits, for example profits earned from overseas festival and prior years.  The gist of Defendants' Point is that Consor's report failed to segregate various revenue streams so that the entire report is flawed and should be precluded.  This argument does not comport with the case law in this Circuit. As set out in depth in the following points below, Defendants' argument for

---

[22] 17 U.S.C. 504(b) states as follows: "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."

17

preclusion of the Consor Report[23] and testimony from Wes Anson is fundamentally flawed and respectfully speaking, must not be considered by this Court.

**1. Plaintiff Met Its Burden Under 17 U.S.C. 504(B), In Supplying To The Court The Gross Profits Earned By Defendants.**

As stated above the Plaintiff's burden is to supply the gross profit numbers to the trier of fact for assessment of damages. Mannion v. Coors Brewing Co., 530 F. Supp. 2d 543, 2008 U.S. Dist. LEXIS 544, (S.D.N.Y., 2008).(Photographer entitled to portion of gross profit of infringer for unauthorized use of photograph in beer advertisement) Under Davis  v. The Gap, Inc., 246 F.3d 152, 2001 U.S. App. LEXIS 5532, (2d. Cir. 2001), the Second Circuit refined the statute's interpretation to require Plaintiff show gross profit is reasonably related to the infringement. Id. at 160. However, *Davis v. Gap* did not shift Defendants burden with regards to the other factors in Section 504(b) of the Copyright Act.

In the Consor report, Anson used the gross profit figures supplied to Plaintiff from Defendants. Plaintiff has submitted, under seal, financial documents received from Afropunk as part of discovery in this matter.  Attached as Exhibit "1" to the Greener Declaration under seal is a Composite financial statement received from Defendant Afropunk LLC. These are the figures sent by Afropunk which are accurately reflected in Figure 1 on page 7 of the unredacted version of the Consor report.  This document showed gross income only for the years 2015 to 2018, which are the relevant years in question. Looking at the source material, those figures are raw numbers with no details.  Mr. Anson accurately used those numbers. Thus, Consor met its statutory burden.

---

[23] Consor's report is attached as Exhibit "F" to the Goins Declaration. Wes Anson is the individual from Consor who authored the report. Consor is an Intellectual Property valuation and consulting firm that issued it.

Defendants argue the report is flawed because Consor used gross number and included financial information not attributable to the festival or from other years.[24]  Putting aside for a moment the issue of whether attribution of revenue from other sources of income is Plaintiff's burden, the raw numbers supplied by Defendant lack any break down of the revenue streams nor any details as to how they were derived. Plaintiff in his discovery requests asked for this detail; however, despite being ordered to produce such detail Defendants failed to supply any intelligible or useful information.

Annexed as Exhibit "3" the Greener Declaration filed in opposition to Defendants Motion in Limine, is an Order dated August 15, 2019, directing Defendants to provide the financial documentation in support of the gross revenue figures originally supplied in Afropunk's composite spreadsheet. Exhibit "2" to the Greener Declaration, filed with the motion to seal, is the document received from Afropunk in response to the Court's August 15th Order.  Even a basic review by the Court would reveal how woefully inadequate this document is.

What Plaintiff was expecting to receive were income statements, cash receipt journals, reports, expenses reports, payment ledgers, yearend reports, etc., standard forms in the business world by which Consor could run their analysis. Instead of getting standard financial accounting reports to review, they received Exhibit "2", which is at best is an unprofessional slipshod printout from someone's home computer.   There are no categories by which revenue and expenses are broken down.  The years are jumbled together, and the document lacks any description by which to identify what the entries were for. Income is mixed in with expenses in varying years basically

---

[24] In Defendants argue in their memorandum that Consor used the wrong years. As the Afropunk financial statement shows that is not true, because defendants only supplied data for 2015-2018.

19

making it a completely indecipherable mess.   And in fact, it was meant to be just that-indecipherable-useless for any accurate inquiry into Defendants actual revenue

To round it out, Exhibits "3"-"8" of the Greener Declaration, submitted with the motion to seal, were also supplied.  These are even less useful, if that is possible, then the document given in Exhibit "2".  Exhibits "3-5" are bank statements from Chase Bank.  To start with they are heavily redacted. No reason is given for this as these were confidential documents subject to a strict protective order. There is no way for Mr. Anson to have known what was redacted and what that might have been concealed. No copies of checks were supplied showing who payment was made to. Finally, statements come from a company called Afropunk Worldwide LLC, which is not a party to this action and were included. No explanation was given as to why a different companies statements were included in the material.

The bank statements are useless to determine Afropunk's true finances because the entries have no details.  Deposits have no correlation to their source or purpose. The purchases listed could have just as easily been for non-festival related purposes, or personal ones for Mr. Morgan and Ms. Cooper. Defendants did not supply documents to back up the statement such as receipts and invoices. Since no journals were provided, Mr. Anson could not verify the information in the account statements.

Seeing these documents, the Court may wonder why Plaintiff did not move to compel the necessary information.   The answer is he did. Starting in April 2019, and continuing through August 2019, Plaintiff made several motions to the Court to compel Defendant to comply with the discovery demanded. Discovery was extended three times so Plaintiff could get the documents it had requested. The Court had set August 30th, as the deadline for close of discovery and filing of summary judgement motions. Although it was requested to be extended, the Court made clear to

20

the parties that the August 30th date was firm.  Defendants were directed to produce financial documents on July 29, 2019. They weren't. On August 9th Plaintiff filed yet another motion to compel disclosure. The Court in its August 15th Order directed compliance by August 19th, which was just eleven days from end of disclosure. In those 11 days, there were four party depositions held, and two expert reports needed to be filed. There was simply no time left to compel additional information. Plaintiff had to complete expert disclosures or risk being precluded if they were not filed on time.

Defendants played the game of "beat the clock" and won. Mr. Anson did the best he could to decipher the information supplied for his report. It was Defendant Afropunk that failed to provide accurate and detailed information as to its finances, so defendant cannot be heard to complain now the Plaintiff failed to supply accurate information to the Court or the Jury regarding gross income.

Where an infringer fails in its burden to provide satisfactory evidence of their profit or revenue information, the scales should be tipped against the infringer in deciding whether to exclude gross profit figures. ("failure and refusal to produce the most satisfactory evidence of sales-or absence of sales-leaves his [the infringer] cause exposed to indirect and less definite and certain methods of proof …. And where, as here, the defendant controls the most satisfactory evidence of sales the plaintiff needs only establish a basis for a reasoned conclusion as to the extent of injury caused by the deliberate and wrongful infringement.") Fournier v. McCann Erickson, 242 F. Supp. 2d 318, 328, 2003 U.S. Dist. LEXIS 703(N.Y.S.D, 2003)[quoting Deering, Milliken & Co. v. Gilbert, 269 F.2d 191, 1959 U.S. App. LEXIS 5419, (2d. Cir 1959)].

As *Fournier* held, a Copyright owner should not have its damages analysis excluded where there was a lack of proper information from the infringer. ("Accordingly, it is clear that "when the

21

defendant fails to provide satisfactory evidence of its actual sales, the court may rely on indirect or circumstantial evidence …. The plaintiff need only establish a basis for a reasoned conclusion; the court may then extrapolate from the available evidence to determine the amount of the recovery.") Id. [Citing with approval Aris Isotoner, Inc. v. Dong Jin Trading Co., Inc., 1989 U.S. Dist. LEXIS 18446, 1989 WL 236526, at *6 (S.D.N.Y. May 16, 1989).]. Given the facts here, Consor's Report supplied a reasonable basis for its figures by which the jury can extrapolate the information to determine gross income figures.

**2.   Plaintiff Has Supplied The Necessary Casual Nexus Between Infringement And Gross Profits**.

*Davis v. Gap*, supra, involved an eyewear designer who sought disgorgement of profits from the Gap Inc. for infringement of his copyrighted eyeglass design used in an advertisement put out by the Gap clothing store.  The Second Circuit, in reviewing the holding below, held that that Section 504(b) was not to be construed so broadly as to encompass the defendants' profits earned from a multitude of business and other divisions, even from other lines of products in The Gap stores.  As the estimated profit of the company at the time was 1.66 Billion Dollars, this narrowing made sense. Especially, given the nature of the infringement. But the facts of this case are different.

In the evidentiary information supplied by Defendants, nothing established Defendant Afropunk had any other lines of business other than the festival it produces. Defendants' financial documents fail to establish any other source of revenues. Document "1" described above, simply lists the festivals and gross revenue for the four years in question.   Based on the available information Mr. Anson has rightly assumed all the revenue is from ticket sales and merchandize at the festivals. Defendant had failed to supply proper documents to support its claims now.

22

Defendants argue Anson's use of the gross number is flawed for two reasons: 1) he did not make a causal connection between the infringement and the profits; and, 2) he failed to account for revenue earned from factors besides the infringement.

As outlined in Point A. above, in deciding whether to preclude expert testimony, facts of the case are central to the determination. Also as stated in Point A. above, this is a direct copying infringement matter.  No expert is needed to established that the photographs are 'substantially similar' to ones used by Defendant Afropunk, they are the exact photos. There is no dispute on this point. Defendants have admitted they had access to the photographs in Plaintiff's DropBox, Finally, the documentary evidence in the case established that the photos were used at the festival in the preceding four years. Again, not denied by Plaintiff.  This admission can be seen throughout the testimony of Mr. Morgan in his deposition annexed hereto as Exhibit "1". Defendant's defense is that they have a license to use the works in question, and not a denial of their use. Since no written license was ever produced, at best Defendants can allege only an oral or written one the existence of which is a question of fact not decided yet.

Mr. Anson was entitled to rely on the facts in this case in deriving his opinion. ("Experts are entitled to rely on facts or data that "experts in the particular field would reasonably rely on.") Hopkins v. AMTRAK, 2015 U.S. Dist. LEXIS 196952, 2015 WL 13741721*19. (E.D.N.Y., 2015). The Court bases its reliability determination on how he extrapolated those facts for his opinion and if his conclusion is supportable based on those facts. ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.") Amorgianos v. Amtrak, supra, at 267. Anson based his calculation on a justifiable fact: other than

23

the limited use license admitted to by Plaintiff, Defendant had no permission to use the works.[25]

Further, based on documents reviewed in the matter, Anson assumed that Defendants used the

Photographs for marketing and promotion of their festival from 2015-2018. Finally, after

reviewing the documents Mr. Anson, determined Afropunk's use to be all "encompassing" and

"unfettered". This conclusion is reasonable based on the evidence in this case.[26]  Therefore, how

much credibility to give to those facts go to weight not admissibility.

Defendants attack the report as flawed because it did not establish how and where the

photos were used and discount other factors such as musical acts that appeared at the festival.  As

to the first point, Plaintiffs documents provided information regarding the infringing uses.  Hard

information as to use by Defendants was not easy to come by.  Multiple motions were filed to

compel this information. Although requested, Defendants failed to produce coherent

documentation as to what graphics were used at festivals locations or in their marketing. Afropunk

did supply examples of graphics, but they were not complete and not for every year, for example

nothing from the Brooklyn 2016 festival was produced. And not for each festival between 2015 to

2018. When Morgan was questioned in his deposition he consistently equivocated as to whether

the graphics were used by Afropunk or not. See Morgan transcript, Generally pages 139-177.

Despite arguing that Mr. Anson did not account for use of other photographers, Defendants

produced no information to support their argument regarding use of other photography.  Mr.

Einhorn, their expert, did not present evidence regarding what if any other photographs from other

photographers were used in graphics, posters, marketing material, websites, or on social media

accounts.  Defendants have the burden to show what percentage of those other photographs were

---

[25] Section III, page 6 of the August 29, 2019 Consor report, and section III of the October 14, supplemental Report. Exhibits 6 and 7 to the Goins Declaration.
[26] Anson Transcript, Page 45 L. 20 to p. 46 L. 8. Exhibit "H" to the Goins Declaration.

24

used as compared to Plaintiffs photos at the festival and in marketing support.  Defendants were required under Section 504(b) of the Copyright Act to supply this information.  Mr. Anson was not required to guess as to amount or proportion.  His conclusion based on the information provided to him was not unreasonable or unjustifiable.

**3.  Defendants Failed To Meet Their Burden Under 17 U.S.C. 504(B), In Identifying Their Costs and Expenses or "Elements Of Profit Attributable To Factors Other Than The Copyrighted Work."**

a). <u>Defendants failed to establish other factors than use of the infringing photos were behind the increase in ticket sales for the Afropunk festival</u>.

Under the Copyright Act it is the infringer's obligation to supply evidence of other factors as to revenue earned from non-infringing activity. As stated above in prior points, Plaintiffs obligation is to provide gross income information solely. Defendants [27]criticism of Anson's Methodology is completely off base. As set out in Point A above, there is strong evidence connecting the use of the photographs to attendance. As also set forth in Point A above, Mr. Einhorn, Defendants own expert concedes that viewing the photos in the Afropunk marketing could be a motivating factor for attending the festival and buying merchandise.  The connection made in the Wallace report is a 'reasonable' one. Thus, Plaintiff satisfied its burden.

As Defendants financial records were a mess, it was more than reasonable to assume all festival income was for ticket sales, and then use those sales in his gross income figures.  Mr. Anson and Plaintiff in general have no obligation to the investigate other factors beside the use of the photos to account revenue from 2015 to 2018.  While Defendants consistently argue that musical acts were the driving factor behind revenue, they provided no actual evidence of this fact for Anson to factor into his report. Their argument is based purely on ipse dixit reasoning.  As an

---

[27] Point VI (i) to the Defendants Memorandum of Law in support. Page 16.

25

expert Anson is not required to assume facts not in evidence or take Defendants' word on this issue.

Mr. Einhorn is not an expert on music festival or concert attendance and is not qualified in testifying to the various factors underlying consumer motivation to go to a concert. In any event Einhorn provided no authoritative studies which supported his statements. 'Common sense' is not sufficient bases for his conclusion that musical acts at the Afropunk festival are the primary motivator of attendance. Defendants did not engage an expert to provide such analysis to the Court.

While Defendant argue acts such as Jill Scott were the motivation behind such attendance figures, they provided no statical analysis by which the trier of fact could use to determine the merits of the argument. For example, statistics showing what the attendance numbers were for a given festival day where a supposed well-known performer like Jill Scott or Lenny Kravitz performed, versus days lesser known acts performed. As a festival production company, it is assumed Afropunk had the ability to produce this information, but either failed to keep these statistics or chose not to disclose them in this action.[28] Because Defendants provided no information on the above points, Mr. Anson could not apportion the revenue based on other factors.

In shirking their duty to supply evidence or proof of their allocations, Defendants is hoping to use, the Davis v. Gap holding as shield to hide behind. As subsequent courts have held *Davis,* did not change the fundamental burden allocated between the parties. Plaintiff need only show a causal connection to sustain its burden. It is not a Copyright owners' burden to establish all profit was "derived solely and directly" from the infringement. See, Graham v. Prince, 265 F. Supp. 3d 366, 2017 U.S. Dist. LEXIS 111521, at *43 (N.Y.S.D., 2017) ("Davis did not disrupt the basic

---

[28] Attendance information was requested by Plaintiff as part of their initial discovery demands served in February 2019.

burden-shifting framework of 17 U.S.C. § 504(b); it does not require the copyright owner to provide evidence of "profits derived solely and directly from the infringing activity." After Davis, indirect profits — derived from the use of the copyrighted work to promote sales of other products — are still "legally cognizable if the copyright owner can provide sufficient proof of a causal nexus" to the infringement." [Citations omitted] See also, Fournier v. Erickson, 242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003); Broadspring, Inc. v. Congoo, 2014 U.S. Dist. LEXIS 177838, 2014 WL 7392905, at *9 (S.D.N.Y. Dec. 29, 2014). Complex Sys., Inc. v. ABN Ambro Bank N.V., 2013 U.S. Dist. LEXIS 160291, 2013 WL 5970065, *2 (S.D.N.Y. Nov. 8, 2013).

   b). The Consor Report Could properly consider indirect revenue in its analysis.

Assuming gross income earned in the use of the photographs at issues are not considered direct profits, Courts in this Circuit have held the Davis  v. Gap Inc. holding does not restrict a copyright owner from seeking indirect profits from an infringer.  Mr. Anson was entitled to use gross ticket sales, even if indirectly tied to the use of promotional and marketing material from the festivals containing Plaintiff's photographs. In Complex Sys. v. ABN Ambro Bank N.V., 2013 U.S. Dist. LEXIS 160291, 2013 WL 5970065, the District Court identified a two-step process to tie infringement to indirect profits "(1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and (2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement". Id at 2013 U.S. Dist. LEXIS 160291, *7.

The Wallace report established the casual nexus between use of the photographs in Festival marketing and branding to profits Afropunk earned from ticket sales. However, Mr. Anson, a qualified expert in his own right, considered Afropunk's use of the photographs to be all

27

encompassing and unfettered [29] and independently established the nexus between infringing use of the photographs on the marketing and merchandising to the revenue reported by Afropunk. Afropunk's financial disclosures did not detail 'a complex income stream' which required Plaintiff to tie the infringing uses to the income stream. Afropunk markets the festival for the sole purpose of selling tickets to the event, and then products like food and merchandise to attendees. So, inclusion of these numbers in the Consor report was proper and the burden shifted to defendants who failed to meet their burden.

c). <u>Defendants failed to provide acceptable evidence concerning profits and expenses, and therefore such an analysis was not necessary to the Consor report</u>.

The Copyright Act puts the burden on Defendants to provide evidence of allowable costs and deductions from gross income. If a defendant wishes to have these numbers taken into account, they must show what they are and prove they are allowable deductions. There is no doubt that Defendants failed to supply this information and so Anson was not required to deduct those costs from his gross profit calculations. ("To discharge their burden in showing costs, defendants must demonstrate "with some specificity" "that the expense was incurred in the production of the infringing work.). <u>Caffey v. Cook</u>, 409 F. Supp. 2d 484, 504, 2006 U.S. Dist. LEXIS 2090 (N.Y.S.D., 2006)

Afropunk's Financial documents received were totally insufficient to determine what the actual expenses attributable to the festivals were. There was a complete lack of specificity in these documents. Failure to break down allowable deductions for cost and expense should be held against Defendants and not Plaintiff. ("any uncertainty as to profits that is caused by the defendant's failure to keep adequate records of costs will be resolved in favor of the plaintiff.") Id.,

---

[29] Anson Deposition page 86, Exhibit I to the Goins Declaration.

28

[citing, <u>Yurman Design v. Chaindom Enterprises, Inc.</u>, 2003 U.S. Dist. LEXIS 15064, (S.D.N.Y. 2003). Nor, did Defendants' expert, Mr. Einhorn provide any clarity on the issue as he did not conduct a cost analysis in the case.

Although not required, Mr. Anson did consider Defendants' alleged expenses in his analysis of the net profits for disgorgement in his calculations on page 8 of his report.  However, Mr. Anson did not have to accept Afropunk statement that it ran a loss[30], as he questioned the legitimacy of the claimed expense. Documents supplied by Afropunk are legally insufficient to establish that the alleged expenses were allowable expenses which created the loss. See, 4 Nimmer on Copyright § 14.03(c).[31]

**D.    Mr. Anson Presented Proper Actual Damage And Disgorgement Of Profit Analysis In His Report.**

Throughout the motion Defendant argues the Conor report is flawed because Section IV. B. of the report labeled the Damages analysis conducted as "Unjust Enrichment" and not disgorgement of profits.  The same is argued for section IV. C. "Brand Value" Analysis instead of Actual Damages. Mr. Anson performed standard evaluations for both in line with statistical and judicially accepted methodologies for disgorgement of profits and Actual Damages.  What the report mistakenly did was incorrectly label them.

Mr. Goins questioned Mr. Anson on this point in his deposition:

" Q So there's -- there's -- there's no claim or cause of action in either the initial complaint or the amended complaint with regard to unjust enrichment; do I have that correct?
**A Right. It's disgorgement of profits, which is the same as unjust enrichment.**
Q Why do you say that it's -- why do you say that disgorgement of profits is the same as unjust

---

[30] Defendants Memorandum of Law in Support page 17.
[31] "It is therefore likely that the Afropunk festival is indeed profitable and a significant portion of "Other Costs of Operation" includes payments and/or salaries Defendants pay to themselves. As such, the profit generated by Defendants at the expense of Client should exclude Other Costs of Operation and may be calculated by subtracting "Talent, Venue, Production" from total yearly revenues ("Profit") as shown in Figure 2." Anson report page 8.

enrichment?

**A Well, the two -- the two phrases represent the same thing. Disgorgement of profits is a measure of damages in a copyright case. Unjust enrichment is a way of calculating that disgorgement of profit." [32]**

In further questioning later on in the Deposition, Mr. Anson made clear that he used terminology improperly to loosely, but that his analysis was relative to those in copyright infringement.[33]  On October 14, 2020 Anson submitted a supplemental report. In the report the titles to the two sections were changed, however, the analysis detailed in those sections did not.

FRCP Rule 26(2)(D) allows an expert to supplement a report to correct an error. Parties bear a duty to supplement expert reports or deposition testimony if the disclosure is somehow incomplete or incorrect. Fed. R. Civ. P. 26(e). ("however, an expert may supplement disclosures in a timely manner in order to correct errors.") In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 643 F. Supp. 2d 471,481, 2009 U.S. Dist. LEXIS 62649.  As the analysis is identical in both sections B. and C. in the supplemental report supplied by Consor, it was not prejudicial to Defendants, and a proper amendment.

**E.  The Anson Report has presented a proper valuation of Actual Damages in this matter.**

The Court of Appeals held in *Davis v. Gap Inc*. that a copyright owner may recover the value of the thing lost to it by virtue of an infringement by another party.  However, the Court realized that the value of what was lost may not be found only in the sales or profits of the infringer from the infringement because, as the Defendants herein claim, there might be none. However, this does not change the fact that something of value was taken by the infringer and damaged the

---

[32] Anson Transcript page 44, L. 8 to 44. Exhibit "H" to the Goins Deceleration.
[33] Id at page 107, L.14 to p.108, L.20.

owner. Recognizing that the infringement should not benefit the infringer or allow it to get away

with it, the Court put the matter thusly:

"It is important to note that under the terms of § 504(b), unless such a foregone payment can be considered "actual damages," in some circumstances victims of infringement will go uncompensated. If the infringer's venture turned out to be unprofitable, the owner can receive no recovery based on the statutory award of the "infringer's profits." And in some instances, there will be no harm to the market value of the copyrighted work. The owner may be incapable of showing a loss of either sales or licenses to third parties. To rule that the owner's loss of the fair market value of the license fees he might have exacted of the defendant do not constitute "actual damages," would mean that in such circumstances an infringer may steal with impunity. We see no reason why this should be so. Of course, if the terms of the statute compelled that result, our perception of inequity would make no difference; the statute would control. But in our view, the statutory term "actual damages" is broad enough to cover this form of deprivation suffered by infringed owners.

Davis v. Gap, Inc., 246 F.3d at166, In so finding the above, the Court held that a copyright owner

can seek to seek to show what an owner might recover in a fair market analysis of what the infringer

might be expected to pay for the use of the works in question.  As the Court stated, "The question

is not what the owner would have charged, but rather what is the fair market value." Id.

In section VI. C, of the Consor report, Mr. Anson sets out the exact analysis.  Taking into

consideration the uses observed by Mr. Anson, he set out to figure what the fair market value of

the use of the photographs would be for the manner and frequency of those uses.  As an expert in

Intellectual Property licensing, Mr. Anson has the requisite ability and knowledge to testify what

a market rate would be for Plaintiff photographs used to rebrand an entire festival.

Mr. Anson considered what Afropunk would have to pay as fair market for use of the

Bayoh photographs to use in the manner in which they did: at the festivals, in advertising,

marketing, promotions, on line and social media.

By consulting relevant authority on licensing rates, Mr. Anson came up with a fair market

rate to license the photos used for six festival over four year. The was number 6.1%, Anson testified

that this would be against gross revenue to come to his number of $4.4 million in actual royalties. His approach is described in his Deposition on pages 81 L. 18, to the bottom of page 87. Courts in this District have upheld the fair market value approach as proper. ("The standard for determining the fair market value of the infringing use is an objective one — 'the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer.'") (quoting Davis, 246 F.3d at 167). Although "the amount of damages may not be based on 'undue speculation,'" the fact that "finding the fair market value of a reasonable license fee may involve some uncertainty . . . is not sufficient reason to refuse to consider this as an eligible measure of actual damages." Davis, 246 F.3d at 166." ) Laspata DeCaro Studio Corp. v. Rimowa GmbH, 2018 U.S. Dist. LEXIS 103347, *17, 2018 WL 3059650. See, Getaped.com, Inc. v. Cangemi, 2001 U.S. Dist. LEXIS 22591, 2001 WL 1606732; Pasatieri v. Starline Prods., 2020 U.S. Dist. LEXIS 6251, 2020 WL 207352;

Notwithstanding the fact that Afropunk may have convinced other less unfortunate photographers to give photos to them for free with no royalty, does not affect the objective market they would have to pay for the work. What Afropunk actually paid does not affect the fair market analysis used in the Consor report. ("This argument does not challenge the sufficiency of Laspata's evidence of its actual damages. Rather, it is a factual dispute to be resolved by the jury in determining the amount of Laspata's actual damages.") Laspata DeCaro Studio Corp. v. Rimowa GmbH, 2018 U.S. Dist. LEXIS 103347, *19. To hold otherwise would work the same injustice to Mr. Bayoh that the Court of Appeals warned against in *Davis v. Gap Inc*.


**F.    Consor is an economic valuation company and was qualified to make the assessment as to the damage calculations.**

32

Weston Anson is Chairman of CONSOR, an intellectual asset Consulting firm which specializes in trademark, patent and copyright monetization, valuations, and expert testimony. He received his MBA from Harvard University and later went on to be the youngest Vice-President and corporate officer at Playboy Enterprise, Inc., where he launched most of their licensing programs. Not only is Mr. Anson a branding and licensing expert, he is also an acknowledged pioneer in developing the methodologies that enable accurate valuation of IP on a worldwide basis. Since founding CONSOR over 20 years ago, he has developed numerous monetization strategies for major corporations and has performed valuations of hundreds of intellectual property components. His clients are some of the largest companies in the world.

Mr. Anson is a prolific author on the subject of intellectual property and has published over 150 articles in the United States and Overseas concerning IP valuation and licensing. He is also the author of eight books on various aspects of intellectual property which has been published by the American Bar Association as well as SIPO in China. He has taught classes on licensing to graduate and law students.

Mr. Anson is a world-renowned IP expert with testifying experience in the United Kingdom, Europe, and US. His experience has been established and reaffirmed in trial testimony, multiple depositions, and numerous rule 26 reports. Notable cases include the landmark Jesse Ventura case in which the eighth circuit court of appeals noted "Anson's qualifications are quite impressive, and certainly more so than those of some experts whose testimony this court has permitted.".

In his CV Mr. Anson lists dozens of cases where he has appeared as an expert in the last 20 years. Even Defendants admit he is an expert in Trademark Licensing. Defendant set forth two cases where his report was not accepted by the court in the last 20 year. This fact alone should not

33

disqualify his testimony.  Counsel misleads this Court regarding one of the cases, Olive v. GNC.

Mr. Testified that he terminated his work because Plaintiff's counsel mislead him and submitted

fraudulent data.  The report in question was a draft and not final. It was withdrawn by Consor.

Plaintiff's Counsel used it anyway with out Anson's knowledge or consent, prompting him to file

an ethical complaint against the attorney.[34]

## VI   THE COURT HAS ALREADY RULED THAT VICARIOUS AND SECONDARY LIABILITY FOR MATTHEW MORGAN AND JOCELYN COOPER IS A MATTER OF FACT TO BE DETERMINED AT TRIAL.

In another example of Defendant trying to relitigate the summary judgment motion,

Defendant moves to have claims against the individual defendants precluded in an improper

Motion in Limine. This is the same claim submitted in their summary judgment application which

was denied by the Court.[35] In refusing to dismiss Cooper, the Court found her to be a Co-CEO of

Afropunk LLC.  Court Docket number 88-2 the Cooper Deposition was submitted in opposition

to the motion.  In the Deposition at pages 6, line 10, page 16 line 19, and page 23 line 23, she

admitted her management of and role in Afropunk, including supervising marketing.

In the decision the Court cited to the relevant authority as to why Ms. Cooper should not

be dismissed from the case, "Vicarious liability is available against a defendant who had the "right

and ability to supervise" the direct infringer and "an obvious and direct financial interest in the

exploitation of copyrighted materials." EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844

F.3d 79, 99 (2d Cir. 2016).  This would include Mr. Morgan as well the other Co-owner of

Afropunk. Mr. Morgan's admitted he is the co-owner and director of Afropunk LLC in his

deposition, which is attached hereto. There are ample instances where he admits to direct

---

[34] Anson, deposition pages 34-42 and 106-107.
[35] Section VI to the Court's January 15, 2020 order, DCKT #98.

involvement and control over the use of the photographs in concert visuals, graphic art used in the marketing and promotion of Afropunk's festivals in his testimony.

Since that time nothing has changed in the factual posture of this case, as there is no basis in fact for this request and Defendants are wasting the Court's time. Even if they did not know of the infringement, which seems impossible, Courts in this district have held that individuals who have the right and ability to supervise infringing copyright activities and a direct financial interest in such activities are not shielded from liability even though they have no actual knowledge of the infringement, Gershwin Pub. Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159,1161("Although the Act does not specifically delineate what kind or degree of participation in an infringement is actionable, it has long been held that one may be liable for copyright infringement even though he has not himself performed the protected composition"); and see also, EMI Entertainment World, Inc. v. Karen Records, Inc., 806 F.Supp.2d 69 (S.D.N.Y. 2011). Cooper. Peer Intern. Corp. v. Luna Records, Inc., 887 F.Supp. 560 (S.D.N.Y. 1995).

The Court had reviewed a direct witness affidavit Andrea Dwyer who's stated that Ms. Cooper not only knew Plaintiff's work, she was involved in getting his work exposure on CNN. Finally, most of the emails submitted as evidence in the opposition had a CC, to Ms. Cooper. Absolutely nothing has changed since these factual submissions to prove Morgan and Cooper had no knowledge of the infringement, or that they had no control over the activities of Afropunk LLC. Defendants request should be denied in its entirety.

## V. CONCLUSION

For all of the reasons stated above, Defendants motion in limine should be dismissed in its entirety.